**UNIQ COMPUTER CORPORATION (for the Benefit of UNITED STATES LEASING CORPORATION), Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 465–86C.

United States Claims Court.

April 23, 1990.

Andrew Mohr, Washington, D.C., for plaintiff.

Steven A. Hemmat, Washington, D.C., with whom was Asst. Atty. Gen. Stuart M. Gerson, for defendant.

## OPINION

REGINALD W. GIBSON, Judge:

This contract case is before the court on cross-motions for summary judgment filed by plaintiff Uniq Computer Corporation (Uniq), on behalf of its assignee United States Leasing Corporation (USLC), and the United States, on behalf of the Department of the Air Force (Air Force or defendant). The parties also move, in the alternative, for partial summary judgment on the relevant issue of liability. The subject dispute arose out the defendant's solicitation, award, administration, and eventual non-renewal of certain option periods on an initial contract for the lease of an automated data processing (ADP) computer system.

As a consequence of certain alleged conduct by the Air Force, Uniq avers three separate claims as a basis for $387,939 in entitlement damages. More specifically, plaintiff avers that it is entitled to (1) partial termination for convenience damages for the defendant's cancellation of certain system equipment in the middle of an op-

tion year term; (2) breach of contract damages occasioned by the defendant's failure to purchase the remainder of the system after it allegedly exercised a contract option clause to do so; and (3) damages for past performance below cost occasioned by the defendant's non-renewal of certain of its options to extend the lease contract after it allegedly induced plaintiff to offer lower lease rates in the belief that all such options would be exercised. Jurisdiction is premised herein on 28 U.S.C. § 1491.

Both cross-motions for full summary judgment are DENIED, as there are genuine issues of material fact on the question of damages. On the alternative cross-motions for partial summary judgment, Uniq's motion is GRANTED only to the extent that the defendant is liable for a partial termination for convenience. The cross-motion for partial summary judgment is DENIED with respect to liability on its claims for breach of contract and past performance below cost damages. Concomitantly, the defendant's cross-motion for partial summary judgment on these liability issues is DENIED in part and GRANTED in part.

*Facts*

The subject dispute involves a fixed-price service contract, whereby the Air Force procured a "Scientific Support Computer System" through a lease agreement with Uniq. The system was to be acquired on a competitive selection basis through the award of an initial two-month contract that included an option to renew for each of five succeeding one-year terms. *See generally* Defense Acquisition Regulations (DAR), 32 C.F.R. §§ 1–1500—1–1506 (Options); *cf.* 32

C.F.R. § 1–322 (Multiyear Contracting). The leased equipment obtained by the Air Force was intended for use at the Air Force Institute of Technology (AFIT) at Wright–Patterson Air Force Base (AFB), Ohio.

Thus, on March 31, 1982, the Air Force issued Request for Proposals (RFP) No. F33600–82–R–0319. The solicitation was disseminated by the Air Force Contracting Division, Specialized Contracting Branch at Wright–Patterson AFB, Ohio. Section B–1 of the RFP provided that:

> *The contractor (offeror) shall furnish the data processing equipment* as specified in Section C, Description/Specification, *for the period 1 August 1982 or date of contract award, whichever is later, through 30 September 1982.* The contractor (offeror) shall furnish by make and model a purchase price, price per month for lease, and price per month of maintenance....

(emphasis added).

Pursuant to contract clause H–1,[1] the solicitation also unequivocally informed all prospective offerors that any contract award would be subject to renewal options in the Air Force for *each* of five subsequent one-year periods. Consequently, in addition to requesting proposals for the original two-month contract period, the solicitation further required, in Sections B–2 through B–6 of the RFP, the contractor to submit pricing data *for each* of the subsequent five one-year option periods, fiscal years (FY) 1983, 1984, 1985, 1986, and 1987.[2] The RFP further instructed that bids which did not include fixed prices for each respective option period would be re-

---

**1.** H–1, "Option to Extend the Term of the Contract," provided:

> *This contract is renewable, at the option of the Government,* for the performance periods reflected in Section B and at rates no higher than specified in the schedule. Options will be renewed for the period specified in Section B by the contracting officer giving written notice of renewal to the contractor within 30 days prior to expiration date provided that the contracting officer shall have given preliminary notice of the Government's intention to renew at least 60 days before this contract is to expire. (Such a preliminary notice will not

be deemed to commit the Government to renewals.) *If the Government exercises this option for renewal, the contract as renewed shall be deemed to include this option provision. However, the total duration of this contract, including the exercise of any options under this clause, shall not exceed the remainder of FY82 from date of award plus five years.* (emphasis added).

**2.** Each respective fiscal year after the initial two-month contract term was to commence on October 1 of the previous calendar year and conclude in the following year on September 30.

jected as nonresponsive,[3] as all offers were to be evaluated according to the total price of proposals for both the initial contract term and all option periods.[4] While the solicitation stated that offers that did not include fixed prices for each option period would be viewed as nonresponsive, it also provided that evaluations based on bids for the option periods would not obligate the defendant to exercise those options.[5]

Therefore, in order to submit a responsive bid, offerors were required to make a proposal for the initial two-month contract period and each of the five individual option periods. Inasmuch as the Air Force would retain the right to renew the lease for five years, the terms proposed by the solicitation created the potential of a lease agreement covering a period ranging anywhere from a *minimum* of 2 months to a *maximum* of 62 months.[6] The use of this type of option contract solicitation, according to the terms of the RFP itself, was due to a lack of available funds beyond the end of each respective fiscal year.[7]

On May 1, 1982, Uniq submitted its responsive offer, with pricing information for the initial two-month lease term and *each* of the five following option years. On June 2, 1982, Uniq modified its proposal to include more detailed line item lease and purchase pricing information for the five option years. Subsequently, on June 21, 1982, the defendant accepted the revised proposal and informed Uniq of the award by telegram.[8]

3. H–20, "Fixed Prices," provided:
 To be considered responsive to the solicitation offerors must offer (1) fixed prices for the initial contract period ..., (2) fixed prices ... for *each separate option renewal period* which must remain in effect throughout that period, and (3) fixed prices ... for all required option quantities.
 (emphasis added).

4. H–21, "Evaluation of Prices," provided:
 Offers will be evaluated for purposes of award by adding the total price of all optional periods to the total price for the initial contract period covering the initial system or items.

5. H–22, "Exercise of Options," provided:
 Evaluation of options will not obligate the Government to exercise the options. Offers which do not include fixed or determinable *systems life prices cannot be evaluated for the* total requirement and will be rejected.

6. Contract clause H–1 clearly stated that "the total duration of this contract, including the exercise of any options under this clause, shall not exceed the remainder of FY82 from date of award plus five years." *See* note 1, *supra.* The length of the lease term was one subject discussed at a pre-proposal conference for prospective offerors, held on April 13, 1982. The transcript of this discussion was made a part of the solicitation by Modification No. 0002, on April 21, 1982. The Air Force explained the lease renewal requirements of the RFP by stating:
 As far as current plans, there is no question that we would exercise the option for FY83.... there are five 1–year options in the RFP. So it [the lease] is 2 months plus 5 years and *according to what these people tell me here* ... there is no reason to think we are going to get rid of it after 4 months, 6 months, or a year. Aside from budgetary issues, what we really look for in this particular machine,

is that *we want to stay as close as we can within the government procurement constraints to the state-of-the-art in computer technology....*
(emphasis added).

.7. H–19, "Fixed Price Options Provision," provided:
 a. This solicitation is being conducted on the basis that the known requirements extend beyond the initial contract period to be awarded, but due to the unavailability of funds, including statutory limitations on obligation of funds, the option(s) cannot be exercised at the time of award of the initial contract.
 b. There is reasonable certainty that funds will be available thereafter to permit exercise of the options. Because realistic competition for the option periods is impracticable once the initial contract is awarded, it is in the best interest of the Government to evaluate options in order to eliminate the possibility of a "buy-in."

8. The award telegram stated:
 Your proposal dated 01 May 1982 and as revised 02 June 1982, concerning request for proposal F33600–82–R–0139 for lease including maintenance of a scientific support computer including UMIX 4.1BSD, 32V operating software is hereby accepted and award [sic] at an estimated total cost of 977,699.30 [sic] for date of award through 30 September 1987. A contract in the usual form dated 21 June 1982 and numbered F33600–82–C–0454 incorporating all the terms and conditions of the contract hereby created is being prepared and will be forwarded to you in the very near future. The above contract will include the following: *contract award is for the period from date of award through 30 September 19882* [sic] for the computer hardware....
 (emphasis added).

The parties thereafter executed Contract No. F33600–82–C–0454 for the lease of a Digital Equipment Corporation (DEC) VAX 11/780 computer system, including peripherals, software, installation, and maintenance. That contract incorporated all the terms of the solicitation as previously discussed. More importantly, it set out the essential contract terms by separate paragraph:

> Contract award is for the period from date of award through 30 September 1982 for the computer hardware listed on page 1m at a cost of $19,251.30 plus a one-time charge of $7,800.00 for 90–day extended warranty, $7,500.00 for software installation, $4,202.00 for hardware installation, and the following software required special optional features listed on pages 1LL and 1mm: package C, DYNAMO III/F—$12,300.00; package N, IMSL—$4,400.00. Total Award—$55,453.30.

The lease contract *commenced* on August 11, 1982. The equipment was delivered and installed at AFIT in a timely fashion, after which it was accepted and used by the defendant. The performance of the equipment was at all times satisfactory and is not at issue in this case. Uniq subsequently assigned its rights to receive lease payments accruing under the contract to USLC in December of 1982, which the defendant recognized. Thereafter, pursuant to contract clause H–1, the Air Force did in fact renew the lease for three successive option periods, *i.e.*, FYs 1983, 1984, and 1985. Contract Modification No. P00001, issued on November 23, 1982, renewed the contract through FY 1983; Modification P00004, issued on November 8, 1983, renewed the contract through FY 1984; and Modification No. P00006, issued on October 1, 1984, renewed the contract through the end of FY 1985.

By letter dated November 26, 1984, shortly after contract performance commenced for FY 1984, the contracting officer, Guy King, directed Uniq to remove from the premises two 300 megabyte (Mb) disk drive units and controllers that were part of the leased system. This equipment was disconnected sometime after the foregoing date and moved away from the rest of the system. However, the equipment was not removed from Air Force facilities until several months later. Additionally, the November 26, 1984 letter also directed Uniq "to submit a proposal for an *equitable adjustment* of the contract prices as soon as the effective date is established" (emphasis added).

On December 5, 1984, Uniq informed its assignee, USLC, of the defendant's request for an equitable adjustment proposal for the terminated equipment. By letter dated January 2, 1985, USLC directed Uniq to propose an equitable adjustment, for the "Termination of two (2) Disk Drives effective 1/1/85," of $41,484.43. Uniq ·thereafter forwarded a copy of that letter to Ronald Bright, Chief of Resource Management at AFIT on January 14, 1985. Uniq did not, however, send a copy of that letter to the contracting officer, Guy King, who was employed by a separate and distinct Air Force entity, the Contracting Division, Specialized Contracting Branch. Consequently, the contracting officer never received the plaintiff's proposed equitable adjustment, and therefore did not conclude a formal termination for convenience by the government with respect to the two discontinued disk drives.

In addition to the foregoing, the lease contract also contained contract clause H–15,[9] which enabled the defendant to acquire the leased VAX computer system in the event that an outright purchase of the equipment became advantageous to the government. Sometime in mid–1984, the defendant was forced to consider the exercise of this purchase option as a result of congressional appropriation measures initiated subsequent to the solicitation and exe-

---

**9.** H–15, entitled "Purchase Option for Installed Rented Equipment," provided in part:
 a. The Government may, at any time following acceptance of the equipment, purchase any or all of the equipment. The purchase price to be paid by the Government shall be the price listed herein less the purchase accrued stated in the schedule of such price per month of installation.

cution of the lease agreement here in issue. Specifically, Congress directed the Department of Defense (DOD) to purchase all ADP equipment outright.[10] Accordingly, the Air Force issued several directives to its subordinate units designed to implement this congressional objective. Users of leased ADP equipment were consequently advised to prepare conversion analyses on *all* leased systems, and thereafter purchase that equipment. Pertinent to the lease agreement in issue, on November 19, 1984, Ronald Bright, AFIT, directed the contracting officer, Guy King, to "obtain a lease-to-purchase conversion on the VAX 11/780 computer system ... effective 1 April 1985.... currently lease[d] ... from UNIQ Computer Corp. under contract F33600–82–C–0454."

In compliance with said directive, the contracting officer notified Uniq by letter dated December 3, 1984, of the "Government's Intent to Exercise the Purchase Option effective 31 March 1985." Said purchase was to include the entire VAX system, with the exception of the two disk drives previously terminated. Equipment purchase prices were to have been commensurate with pricing schedules set forth in the contract. Uniq forwarded said purchase notification to its assignee, USLC, which, by return letter dated January 2, 1985, advised Uniq that the contract purchase price for said equipment would be "$233,524.51 effective 3/31/85." Uniq then forwarded a copy of USLC's letter concerning the system purchase price to Ronald Bright, AFIT, on January 14, 1985.

On January 29, 1985, Trish Halleen, Midwest Accounting Manager for Uniq, advised Jim Orick of USLC of an inquiry by the Air Force on the prices quoted in response to the aforementioned "Notice of the Government's Intent to Exercise the Purchase Option." Ms. Halleen informed Mr. Orick that the Air Force was extremely displeased with the figures provided for the "possible buy out of the balance of the leased equipment." The letter further stated that "it appears buy out is not being considered at the provided dollar amounts ... since the expectation on the part of AFIT was buy out figures of 50% less than the numbers provided." After this time, no further steps were taken by either party to effectuate a purchase of the equipment under the purchase option clause. Uniq continued to invoice the defendant for *lease payments* due under the remainder of the contract through September 30, 1985. In contrast, it did not at any time invoice the defendant for the purchase price of the equipment on the basis that the December 3, 1984 notification was a *de jure* exercise of the H–15 purchase option.

Therefore, the Air Force continued to make *lease* payments through the remainder of FY 1985, but, sometime prior to April 17, 1985, it determined that it could purchase another VAX system at a lower cost than that specified in its contract with Uniq. Thus, on that date, April 17, 1985, the contracting officer was directed to inform Uniq that the remaining annual renewal option(s) available under the lease would *not* be exercised. Thereafter, the Air Force acquired from a third party identical replacement equipment, differing only to the extent that the new system had slightly more power. In view of these events, the contracting officer notified Uniq, by a letter dated June 3, 1985, that the lease would *not* be renewed for FY 1986 and requested that arrangements be made for the removal of all equipment by the fiscal year ending September 30, 1985.

Given the foregoing, Uniq notified the contracting officer by letter dated August 20, 1985, of its intent to submit a termination for convenience claim on the two disk drives. The contracting officer responded by letter on August 26, expressing the view that no termination for convenience had been effectuated for the two disk drives, because—(i) Uniq was still receiving lease and maintenance payments for those two pieces of equipment, and (ii) those two components were still in place at AFIT. He also reiterated the govern-

---

**10.** *See* H.R.Rep. No. 98–567, 98th Cong., 1st Sess., 18(1) (1983); H.R.Rep. No. 98–427, 98th Cong., 1st Sess., 59(1) (1983).

ment's position that the lease would not be renewed beyond September 30, 1985.

On September 9, 1985, Uniq informed the contracting officer notwithstanding that it believed a termination for convenience had indeed occurred with respect to the two disk drives. This letter also expressed Uniq's position that the non-renewal of the lease contract after September 30, 1985, was also· a termination for convenience. Uniq then informed the defendant of its intention to submit a termination for convenience claim for both the two disk drives and the lease termination, which it did through its counsel on November 25, 1985.

In addition to its termination for convenience claims, Uniq also notified the defendant, for the first time, of its belief that the Air Force was obligated to purchase the entire system, with the exception of the two disk drives, pursuant to the defendant's December 3, 1984 "Notice of Government's Intent to Exercise the Purchase Option." Thus, Uniq's certified claim also sought breach of contract damages for the defendant's failure to carry out the purchase option as executed. Pursuant to Uniq's request for a final decision, the contracting officer formally denied all claims on February 5, 1986. There is no dispute as to the proper certification of any claims presented in this case.

*Contentions of the Parties*

Plaintiff avers three claims for relief. It seeks partial termination for convenience damages for the cancellation of the two 300 Mb disk drives on November 26, 1984, breach of contract damages flowing from the defendant's refusal to purchase the entire system after it purportedly agreed to do so by exercise of the purchase option provision in the contract, and past performance below cost damages for the defendant's alleged inducement of an offer with abnormally low lease rates on a contract that had the potential cf expiring much earlier than the date anticipated by Uniq.

In response, the defendant concedes that there was a partial termination for convenience of the government, but contests the damages claimed by Uniq. As for the second claim, the Air Force denies the forma-

tion of any binding contract to purchase the system, arguing instead that its notice of intent to do so was nothing more than a non-binding expression of *future* intent. Finally, the defendant disputes the viability of the third claim by stating that there was no inducement because Uniq was aware that renewal of the lease contract was at all times subject to an annual availability of funds limitation, thereby precluding any liability to pay additional compensation for either past or future performance.

*Discussion*

We address the subject cross-motions pursuant to RUSCC 56(c), under which summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The rule "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). *Celotex* emphasizes that it is *not* incumbent upon the movant to produce evidence showing the absence of a genuine issue of material fact. Instead, "the burden on the moving party may be discharged by 'showing' ... that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S.Ct. at 2554, *quoted in Sweats Fashions, Inc. v. Pannill Knitting Co.*, 833 F.2d 1560, 1563 (Fed.Cir.1987).

Where the movant has supported its motion with affidavits or other creditable evidence which, unopposed, would establish its right to judgment, the non-movant may not rest upon general denials in its pleadings or otherwise, but must proffer countervailing evidence sufficient to create a genuine issue of material fact. RUSCC 56(f). An issue is *genuine* only if, on the entirety of the record, a reasonable jury could resolve a factual matter in favor of

the non-movant. *Sweats,* 833 F.2d at 1562, *citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *see Pure Gold, Inc. v. Syntex (U.S.A.), Inc.,* 739 F.2d 624, 626–627, 222 USPQ 741, 743 (Fed.Cir.1984). The *materiality* of a fact is determined by reference to applicable legal standards. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *Sweats,* 833 F.2d at 1567.

Given these well-established guideposts, we conclude, at the outset, that the full disposition of this matter is not possible on either cross-motion for summary judgment. This is true because the contentions herein raise material issues of fact on the proper quantum of damages with respect to the sole claim under which plaintiff is entitled to relief on the merits. This being the case, we shall definitively resolve only *liability* issues raised by each respective claim asserted by Uniq.

In this context then, we think the liability issues raised, on what are now in effect cross-motions for partial summary judgment, are properly framed in the following manner, and we shall discuss them hereinafter seriatim:

(i) Did the Air Force effect a partial termination for convenience when it cancelled the lease on the two 300–megabyte disk drives, thereby entitling Uniq to an equitable adjustment?

(ii) Did the Air Force create an enforceable contract to purchase the VAX computer system when it notified Uniq that it intended to exercise its option to purchase the equipment effective as of March 31, 1985, thereby entitling Uniq to breach of contract damages when it later decided not to complete the transaction? and

(iii) Did the Air Force induce Uniq into offering favorable lease rates calculated over a five-year, two-month period on a renewable term option contract of potentially shorter duration, thereby entitling Uniq to compensa-

tion for past performance below cost damages suffered as a consequence of the lease running only three years and two months?

A. *Partial Termination for Convenience*

Uniq contends that the Air Force effected a partial termination for the convenience of the government when it discontinued the two 300 Mb disk drives during FY 1984 performance. Consequently, it contends that it is entitled to an equitable adjustment pursuant to the Termination for Convenience clause incorporated by reference into the contract.[11] As prima facie evidence against the defendant on the issue of liability under this claim, Uniq cites the contracting officer's November 26, 1984 letter directing the removal of those two pieces of equipment "... at the earliest mutually acceptable date, but not later than 30 days after receipt of this notice." For this termination, plaintiff now seeks damages in the amount of $50,728.

On the issue of liability *alone,* the Air Force has conceded, at least twice, that it did in fact effect a partial termination for the convenience of the government. Liability for an equitable adjustment was expressly admitted in the very letter by which it directed plaintiff to remove the two 300 Mb disk drives. In its November 26, 1984 termination notice, the contracting officer unequivocally requested that Uniq "... submit a proposal for an equitable adjustment of the contract prices as soon as the effective date [of termination] is established." The defendant thereby conceded that such an adjustment is proper.

 This fact has been further corroborated by the express concession of the defendant in its subsequent cross-motion for summary judgment now before the court. There it freely states that the "[d]efendant does not dispute plaintiff's claim that the Government's directive to plaintiff to remove two 300 Mb disk drives

11. The lease contract actually incorporated by reference two termination for convenience clauses. The defendant contends that DAR, 32 C.F.R. § 7–1902.16 applies to the service and maintenance portion of the contract, while the lease portion of the contract is governed by DAR, 32 C.F.R. § 7–103.21(b).

and controller units from the overall system was a partial termination of the contract for convenience of the Government." In view of these two explicit admissions of liability by the defendant, it is indisputable that Uniq has established liability entitling it to a partial termination for convenience, and we so hold.[12]

■ Notwithstanding its concession of liability, the defendant vigorously contests the amount of damages claimed by Uniq. Uniq, seeks $50,728, which it alleges is properly calculated as the cost of purchasing the leased equipment and preparatory costs, plus profit, less the net resale value of the discontinued equipment and the percentage of the lease payments made on the terminated equipment through termination. While the termination for convenience clause itself clearly limits damages to those incurred through the date of termination, *see* note 11, *supra,* the defendant nevertheless asserts that plaintiff has failed to provide indisputable evidence in support of its alleged damages. We agree and find that the question of damages on this issue generates a myriad of genuine issues of material fact which precludes plaintiff's entitlement to summary judgment. The motion papers submitted by the Air Force sufficiently deny and put in issue nearly all of the facts material to the averred quantum of damages regardless of the formula used for such determination.

**B. *Option to Purchase***

■ As previously noted, contract clause H–15 permitted the defendant to purchase "any or all" of the leased equipment "at any time." In contemplation of the foregoing, on December 3, 1984, the Air Force forwarded a letter to Uniq stating the following:

> Your attention is directed to Section H–15 of subject contract entitled "Purchase Option for Installed Rented Equipment." This letter constitutes *Notice* of the Government's *Intent To Exercise* the Purchase *Option effective 31 March 1985* for the equipment on the attached list [excepting the two 300 Mb disks]....

(emphasis added).

Notwithstanding the above, the Air Force failed to follow through and consummate the purchase of the leased equipment. This circumstance apparently stemmed from the fact that the Air Force discovered that it could purchase nearly identical equipment at a lower cost than that specified in its lease contract with Uniq. Consequently, on June 3, 1985, it directed Uniq to remove all of the leased equipment at the end of the fiscal year.

Against this background, the dispositive issue is—whether the Air Force exercised its power of acceptance under the purchase option clause, thereby creating a valid and binding contract of purchase, by merely issuing the above-quoted notification of intent. Uniq contends that this was indeed

---

**12.** We observe that Uniq, after asserting five bases for recovery in its complaint, moves for summary judgement on only three claims, Counts II, III, and V. Count II alleges the partial termination for convenience claim, while Count I avers the same conduct, the discontinuation of the two 300 Mb disk drives, as the basis for a breach of contract. Similarly, Counts IV and V allege the same conduct, the defendant's refusal to renew the lease contract for the final two option years, as the basis for claims premised on breach of contract and termination for convenience respectively. While Uniq has not specified its intentions with respect to Counts I and IV, we find that they have been superseded and rendered moot by Counts II and V. This is so because, where as the contract in question has a termination for convenience clause, plaintiff can seek recovery under that clause only; it cannot recover breach of contract damages for the same conduct.

In other words, plaintiff cannot recover damages resulting from the same alleged transgression under theories of breach of contract *and* termination for convenience; it must choose one or the other. When the contract contains a termination for convenience clause, as does the subject contract, the contractor must pursue its remedy under that clause to the exclusion of a breach of contract claim. As stated by our predecessor court in *G.C. Casebolt Co. v. United States,* 190 Ct.Cl. 783, 786, 421 F.2d 710, 712 (1970) (citations omitted):

> [A] Government directive to end performance of the work will not be considered a breach [of contract] but rather a convenience termination—if it could lawfully come under that clause—even though the contracting officer wrongly calls it a cancellation, mistakenly deems the contract illegal, or erroneously thinks that he can terminate the work on some other ground....

the case, because the December 3rd notice unequivocally settled all the material terms of the alleged contract of purchase. The Air Force, on the other hand, argues that the letter was nothing more than a gratuitous expression of a *future intent to purchase*, which, in its view, was insufficient to create a binding contract. We find that the defendant plainly has the more persuasive position of the two arguments.

The undisputed record shows that in each successive lease contract executed between the parties for FYs 1983, 1984, and 1985, the Air Force at all times retained the option to purchase the VAX system under contract clause H–15 if at any time it determined that such a purchase was in the best interest of the government. No limitations were placed on the exercise of that option other than the implicit requirement that the right to exercise lasted only as long as the lease was in effect. Here the Air Force determined that to exercise the option was not in its best interest because it found that the same equipment was available at a lower price than that offered by Uniq. Such is the precise objective of an option contract; it gives the optionee a choice, for a consideration, to act within a stipulated period of time if it is advantageous to do so.

 Stated differently, a noted text writer explains that an option contract is an agreement to keep an offer open for a prescribed period of time during which that offer is irrevocable. 1 S. Williston, *A Treatise on the Law of Contracts* § 61A (3d ed. 1957). An option is "a unilateral contract whereby the optionor for valuable consideration grants the optionee a right to make a contract of purchase but does not bind the optionee to do so; the optionor is bound during the life of the option, but the optionee is not." *Id.* The power conferred on the option holder is called the power of acceptance, who therefore has the legal authority to consummate the contemplated transaction by merely exercising that contractual right. The option giver, on the other hand, is bound to execute the exchange for the duration of the agreement. 1A A. Corbin, *Corbin on Contracts, A Comprehensive Treatise on the Working Rules of Contract Law* § 259 (1963).

It is not the substance of these principles that is in dispute here, inasmuch as both parties agree that the defendant's right to purchase the VAX system at its discretion was indeed a valid option contract. Where they disagree is in their interpretation of the type of conduct or activity that would constitute a binding *exercise* of that option. Plaintiff contends that the December 3, 1984 "Notice of the Government's Intent to Exercise the Purchase Option effective 31 March 1985" was sufficient. The Air Force argues, on the other hand, that this was nothing more than a preliminary notice of a future intent so to act. In our view, there can be no doubt but that the defendant *did not* create an enforceable contract to purchase the subject equipment because we do not think that the qualified notice issued here rises to the level of unconditional assent required by the case law for a true exercise of an option.

It is true that an option is an offer couched in specific terms, the acceptance of which "must be unconditional and in exact accord with the terms of the option." Corbin, *supra*, § 264. "A notice of acceptance that is in any respect conditional *or that reserves to the party giving it a power of withdrawal is not an operative notice of acceptance.*" *Id.* (emphasis added). *See also Civic Plaza National Bank v. First National Bank in Dallas*, 401 F.2d 193 (8th Cir.1968). This requirement is strictly construed. Williston, *supra*, § 61D; *United States v. T.W. Corder, Inc.*, 208 F.2d 411, 413 (9th Cir.1953); *International Telephone and Telegraph, ITT Defense Communications Division v. United States*, 197 Ct.Cl. 11, 453 F.2d 1283 (1972).

These principles are aptly summarized in *Civic Plaza National Bank*, 401 F.2d at 197 (citation omitted), wherein it is held:

The acceptance of an option, to be effective, must be unqualified, absolute, unconditional, unequivocal, unambiguous, positive, without reservation, and according to the terms or conditions of the option.... An acceptance of an option must be such a compliance with the con-

ditions as to bind both parties, and if it fails to do so it binds neither.

We do not think that the defendant's December 3, 1984 notification of intent was "unqualified, absolute, unconditional [or] unequivocal." To the contrary, the notice only underscores what the government intended or expected to do "[by] 31 March 1985." Had the defendant unconditionally intended to *presently* exercise the option it could have done so by simply captioning the document "Notice of the Government's Exercise of the Purchase Option." This it did not do. We can find no language in the December 3, 1984 notice of intent which could be deemed to be a basis sufficient to conclude that the defendant made an unqualified *present* exercise of the purchase option.

Uniq contends, in effect, that the prospective notification of intent nevertheless satisfies the requirements of an unconditional present assent. This is so, argues plaintiff, because the notice was a clear and unambiguous statement of *present* intent to exercise the option for identifiable equipment, at a price capable of definite determination under the schedules set out in the lease contract, at a date certain for purchase. In short, Uniq avers that, because "nothing [was] left open to negotiation," the notice was an unqualified acceptance of the purchase terms offered in the H–15 option clause. We disagree in that we cannot read a "present" intent into said notice.

Even if we were to find as Uniq argues that the defendant's December 3rd notice of intent to exercise the purchase option left no room for further negotiation on the material terms for a contract of purchase, which we do not, such a finding would not, on the undisputed facts here, lead us to the conclusion that the notice also conveyed an unconditional expression of a present intent to be bound. In order to conclude that there has been an unconditional exercise of the option, we believe that there must be some form of concomitant proof, as part and parcel of the required showing of unqualified, unambiguous assent, to demonstrate that the optionee, such as the defen-

dant here, had a *present* intent to exercise the option. This is true because "*A statement by the optionee of a present intention to accept in the future is different from a statement of an intention to accept now....*" Corbin, *supra*, § 264 (emphasis added). The defendant's December 3rd notice contains no such expression of present intent "to accept now." Indeed, it conveys nothing more than a non-binding notice of the defendant's intent to *exercise* its purchase option *in the future.*

Moreover, we believe that Uniq's course of conduct *after* it received the December 3rd notice of intent supports our finding. We so conclude inasmuch as it has been held that the subsequent conduct of the parties can be a significant aid in the determination of the meaning understood by each. Corbin, *supra*, § 264.

Accordingly, we place great emphasis on the undisputed statements of Trish Halleen, Uniq's Midwest Account Manager. In a January 29, 1985 letter to Jim Orick of USLC, Ms. Halleen described the defendant's extreme displeasure with the figures USLC, as Uniq's assignee, had provided for the "*possible buy out* of the balance of the leased equipment" (emphasis added). She went so far as to inform Mr. Orick that "... it appears buy out is not being considered at the provided dollar amounts.... since the expectation on the part of AFIT was buy out figures of 50% less than the numbers provided." We interpret these statements of plaintiff as a clear recognition of the qualified and conditional statement defendant provided in its December 3, 1984 preliminary notice of intent.

In addition, the subsequent statements by Ms. Halleen in her sworn affidavit, prepared and submitted as part of the record only after the defendant raised the issue in its briefing papers, fully support a conclusion that Uniq understood the qualified nature of the notice. There Ms. Halleen expressly admits that her use of the phrase "possible buy out" in her January 29, 1985 letter to Jim Orick was intended to reflect what she understood to be the *defendant's* state of mind at the time. In other words, it is indisputable that she admittedly under-

stood that the defendant had not yet in fact exercised its purchase option. Thus, while Ms. Halleen now contends that she thought a binding contract had been created by virtue of the December 3rd notice, her statements in *both* the January 29, 1985 letter and subsequent affidavit show otherwise. They unquestionably demonstrate that the defendant did not have the present intent to make an unconditional and unqualified exercise of the H–15 purchase option. We think this lack of *present* intent was adequately communicated by the qualified language of the December 3rd letter, and that such was the meaning attached to the letter by Uniq.

Further corroborative of the foregoing is the manner in which Uniq managed the Air Force account following its receipt of the December 3rd notice and subsequent knowledge that the defendant was not going to purchase the equipment. In that connection, Uniq continued to invoice the Air Force for *lease payments* on the equipment through the end of the lease term on September 30, 1985, which belies an understanding of a relationship other than a lease. The Air Force similarly continued to make such rental payments according to the terms of the lease contract. Moreover, Uniq accepted these payments as rent without any objection whatsoever. At no time did plaintiff invoice the defendant for the purchase price, either before or after the alleged March 31, 1985 effective date of the purchase.

Moreover, it never objected when that day passed without the effectuation of any formal contract of purchase for the VAX system. In fact, it did not even protest when the Air Force directed that the equipment be removed in its entirety at the end of the lease term. Indeed, it was not until Uniq submitted its certified claim to the contracting officer on November 25, 1985, two months after the expiration of the lease and eight months after the alleged effective date of the contract to purchase, that plaintiff expressed its belief that a contract to purchase had been formed and then breached. The totality of these indisputable facts requires us to hold that Uniq is now asserting a position wholly inconsistent with the position it took during contract performance. Thus, to the extent that its current position is at odds with both the conditional language of the December 3rd notice and its contemporaneous interpretation of that letter, plaintiff's assertions here must be rejected. Consequently, we hold, as a matter of law, that there was no present unconditional exercise of the option to purchase and, therefore, no contract formation or breach.

### C. *Inducement*

■ We now turn to plaintiff's third claim. Therein it is alleged that the Air Force "induced" Uniq into submitting lower lease rates, allegedly calculated over the maximum possible length of the lease term (62 months), than it would otherwise have offered if it had known that the defendant was not going to exercise *all* five of its lease renewal options. Uniq therefore avers that it suffered losses on what were low, long-term rates when the Air Force decided not to renew the lease due to lack of funds after only 38 months. Consequently, arguing that it did not assume the risk of past performance below cost in the event the lease was not renewed for all 62 months, Uniq contends that it is entitled to additional compensation measured by the difference between the rentals received over the 38 months of the actual lease premised on five-year rates and the rates it would have charged the defendant on a straight 38-month lease. Plaintiff urges us to find a contractual remedy for this claim by construing the Termination for Convenience and Availability of Funds clauses, both of which were included by reference in the contract, together in such a way so as to allocate the risk of the alleged non-renewal losses to the defendant.

While there is no doubt that the argument postured by plaintiff's counsel is both creative and artfully drawn, it is nevertheless transparent and completely devoid of legal merit. We find this to be true because the argument contains a fatal flaw— Uniq has failed to allege any type of wrongful conduct by the defendant. We

think it takes more to succeed on a claim, such as that asserted here, than a bald assertion of inducement, which, in the absence of some transgression recognized by the law, provides no contractual remedy in and of itself. In this context, we observe that Uniq does not contend that the defendant violated any applicable law or regulation, that it misrepresented any material fact, or that it engaged in any type of bad faith or fraudulent behavior. Indeed, the reason for plaintiff's failure to so plead is plainly apparent upon close analysis of the undisputed facts before us; Uniq has no one to blame but itself, as there is not *one* scintilla of evidence to suggest that the defendant's conduct throughout the subject solicitation and award was anything less than above board.

The lack of any wrongful inducement on the defendant's behalf is evident from an examination of the record, beginning with the terms of the solicitation itself. Section B–1 of the RFP explicitly directed all offerors to submit a proposal "... for the period 1 August 1982 or date of contract award, whichever is later, through 30 September 1982." The price quotations requested for each of the five subsequent fiscal years ending on September 30 were specifically described as option periods. The reasons for contracting through the use of options were clearly set out in contract clause H–19, "Fixed Price Options Provision." *See* note 7 *supra.*

The fact that the initial lease contract would be awarded for only a two-month term, thereafter being subject to renewal options wholly within the *defendant's* control, was further communicated to all potential bidders during the April 13, 1982 pre-proposal conference, the transcript of which was later made part of the RFP. *See* note 6, *supra.* At that time the defendant discussed the use of option contracting by stating, in substance, that such an

arrangement was intended to permit the greatest amount of flexibility in an effort to maintain state-of-the-art computer technology capabilities within the parameters of budgetary limitations. Given the statements made by the Air Force at that conference, we see no basis sufficient to warrant a conclusion that the offerors were lead to believe that the subject contract was in actuality intended to run 62 months. The most that can be said of this conference is that the Air Force assured the potential offerors in attendance that it would exercise at least the first option for fiscal year 1983.

It is apparent that Uniq implicitly acknowledged and clearly understood the limitations on the defendant's ability to exercise the renewal options as, indeed, it complied with the terms of the solicitation by offering separate price proposals for the initial two-month term and each of the five option years.[13] This is so because subsequently, by telegram dated June 21, 1982, the Air Force informed Uniq that it had effected a "contract award ... for the period from date of award through 30 September [1982]." Moreover, the actual contract, which was executed shortly thereafter and incorporated the terms of the solicitation, repeated the fact that "contract award is for the period from date of award through 30 September 1982...."

In sum, the totality of these facts necessarily leads us to the conclusion that there is no basis in law for plaintiff's belief that it was bidding on, or had received, a 62-month contract with the Air Force. Consequently, we find that the defendant has met its threshold burden of proof for the purposes of summary judgment by " 'showing' ... that there is an absence of evidence to support [plaintiff's] case." *See Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986).

---

13. Uniq seems to suggest that—by requiring all bidders to submit pricing information on the option periods for evaluation, by including option year pricing information as an evaluation factor for award, and by binding the successful offeror to those option prices should they be exercised—the Air Force was inducing offerors to submit lower proposals on the belief that the

contract would run for 62 months. We reject this position, as the Air Force is permitted to require bidders to submit such option pricing information without binding itself to exercise those options for reasons such as those set out in contract clause H–19. *See* DAR, 32 C.F.R. § 1–504; *see also* J. Cibinic, R. Nash, *Formation of Government Contracts,* p. 532 (1st ed. 1982).

For stronger reasons, by omitting any allegation whatsoever of wrongdoing on the part of the defendant, Uniq has entirely failed in its efforts to "... make a showing sufficient to establish the existence of an element [that would be] essential to [its] case, and on which [it would] bear the burden of proof at trial." *Id.* at 322, 106 S.Ct. at 2552.

■ In addition, plaintiff incorrectly asserts that, as a matter of contract interpretation, the Termination for Convenience and Availability of Funds clauses, construed together, provide a basis to recover additional compensation for its alleged past performance below cost. Plaintiff cites no applicable legal authority in support of this novel theory, which would shift the monetary risks of non-renewal to the defendant. Indeed, none exists primarily because there is no rational basis whatsoever for the application of the Termination for Convenience clause, as it is inapposite to a circumstance where a contract is not renewed for lack of funds. Here we emphasize that the subject lease contract (excepting the two 300 Mb disk drives) was not "terminated" within the meaning of the convenience termination clause, but rather, the contract *expired by its own terms* when the defendant decided not to exercise its renewal options for FYs 1986 and 1987. Having expired by its own terms, there was no contract subject to "termination" by the Air Force. We therefore reject the argument that the defendant has assumed the risk of non-renewal.

■ Instead, we find that, under the Availability of Funds clause, it was Uniq, and not the defendant, that assumed all risks, both past and future, in the event of non-renewal. This is clear from the plain and unambiguous language of DAR, 32 C.F.R. § 7–104.91, which was incorporated into the contract by reference:

Funds are not presently available for this procurement. The Government's obligation hereunder is *contingent* upon the availability of appropriated funds from which payment for the contract purposes can be made. *No legal liability on the part of the Government for payment of any money shall arise unless and until* funds are made available to the Contracting Officer for this procurement and notice of such availability, to be confirmed in writing by the Contracting Officer, is given to the Contractor.

(emphasis added).

This clause deprives Uniq of any and all recourse for additional compensation in the event of non-renewal.[14] It expressly exculpated the defendant from *all* liability if funds were not made available for the procurement. That clause "... is a *limitation* on the government's liability ... [which] sheild[s] the government from liability when it fails to secure funding." *Government Systems Advisors, Inc. v. United States,* 847 F.2d 811, 813 (Fed.Cir. 1988) (emphasis in original); *see Pacificorp Capital, Inc. v. United States,* 15 Cl.Ct. 663, 666–667 (1988). Accordingly, we hold that it was Uniq which assumed any and all risks flowing from a decision by the defendant not to renew its option contract, and thereby reject its claim for additional compensation above and beyond the lease payments it received in conformity with the terms of the lease contract.

*Conclusion*

Plaintiff's cross-motion for summary judgment is GRANTED in part, and only to the extent of liability on the issue of termination for convenience arising from the defendant's cancellation of the two 300 Mb disk drives during the course of FY 1984. The remainder of its motion is DENIED. Concomitantly, the defendant's cross-mo-

---

14. Uniq also invokes the doctrine of *contra proferentum* in support of the argument that the alleged lack of a contract provision expressly allocating the risk of past performance should be construed against the defendant. This assertion fails because the Availability of Funds clause unambiguously limits the defendant's liability. *See Government Systems Advisors, Inc. v.*

*United States,* 847 F.2d 811 (Fed.Cir.1988). Thus, plaintiff's reading of the clause, claiming that it addresses only future liability, is, in our view, unreasonable. *See United States v. Turner Construction Co.,* 819 F.2d 283, 286 (Fed.Cir. 1987) ("*Contra preferentum* [sic] applies when a contractor's reading of an ambiguous contract provision is reasonable in itself.").

tion is GRANTED to the extent that it has demonstrated, as a matter of law, that Uniq is not entitled to either—breach of contract damages flowing from the Air Force's December 3, 1984 "Notice of the Government's Intent to Exercise the Purchase Option," or past performance below-cost damages allegedly flowing from the non-renewal of the lease contract. No costs. There being no just reason for delay, the Clerk shall enter partial judgment accordingly.

The parties shall have 30 days, to and including May 23, 1990, to file a stipulation as to the amount of the equitable adjustment upon which judgment shall be entered against the defendant. Failing such, this issue shall be set for trial following appropriate discovery, filing of Appendix G submissions, and a pretrial conference.

IT IS SO ORDERED.