**UNION PACIFIC CORPORATION, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 58–86T.

United States Claims Court.

June 30, 1992.

John B. Jones, Jr., Washington, D.C., attorney of record, for plaintiff; Ronald A. Bevil and Mary L. Fahey, of counsel.

Kenneth C. Gobetz and Mildred L. Seidman, Dept. of Justice, Tax Div., Claims Court Section, with whom was the Asst. Atty. Gen., attorneys of record, for defendant.

## OPINION

HORN, Judge.

## BACKGROUND

The plaintiff, Union Pacific Corporation (the Corporation), seeks a refund of federal taxes paid for the 1979 tax year pursuant to Chapter 22 of the Internal Revenue Code of 1954 (the Railroad Retirement Tax Act), 26 U.S.C. §§ 3201–3233 (1988).[1] The plaintiff seeks a refund in the amount of $1,068,798.11, subject to an offset for taxes under the Federal Insurance Contributions Act, 26 U.S.C. §§ 3101–3228 (FICA) and the Federal Unemployment Tax Act, 26 U.S.C. §§ 3301–3311.

For the 1979 tax year, the Corporation timely filed Forms 940, Employer's Annual Federal Unemployment Tax Return, and 941, Employer's Quarterly Federal Tax Return, and paid taxes under the Federal Insurance Contributions Act and the Federal Unemployment Tax Act of $13,111.17 and $608,831.44, respectively. Upon audit of the Corporation's 1979 tax year, however, the Internal Revenue Service (IRS) asserted that the Corporation was subject to the Railroad Retirement Tax Act as an "employer" under section 3231(a) of the Internal Revenue Code (Code). 26 U.S.C. § 3231(a).

The plaintiff paid the additional disputed taxes assessed by the IRS and filed a timely claim for refund on December 12, 1983. The claim was denied by the IRS on February 27, 1985. Subsequently, the plaintiff filed suit with this court pursuant to 28 U.S.C. § 1491(a)(1) (1988), 26 U.S.C. § 6532(a) (1988), and 26 U.S.C. § 7422 (1988).

The plaintiff's position before this court is that it should not be required to pay employment taxes pursuant to the Railroad Retirement Tax Act because the plaintiff Corporation falls outside the scope of the term "employer," as defined in section 3231(a) of the Internal Revenue Code. Rather, the plaintiff contends it should only be assessed taxes for the 1979 tax year under the Federal Insurance Contributions Act and the Federal Unemployment Tax Act. The defendant, United States, however, argues that the Corporation fits the definition of the term "employer" under section 3231(a) of the Code; and, thus, the Corporation is liable for the taxes imposed pursuant to the Railroad Retirement Tax Act.

The case is presently before the court on the plaintiff's motion for summary judgment and the defendant's cross-motion for summary judgment on the issue of the application of section 3231(a) of the Code to the plaintiff's 1979 tax year. Both the plaintiff and the defendant have stated that there are no material facts in dispute and that the only issue before the court is a legal issue of statutory construction. In a separate motion for partial summary judgment, filed prior to either of the cross-motions for summary judgment, the defendant preemptively moved for partial summary judgment to preclude the plaintiff from arguing in this lawsuit that any ser-

---

1. The Railroad Retirement Tax Act is the railroad industry equivalent of the Social Security Act (also known as the Federal Insurance Contributions Act), whereby, both the employer and employee are taxed and the proceeds are used to fund employee pensions and other benefits. *See Standard Office Bldg. Corp. v. United States,* 819 F.2d 1371, 1373 (7th Cir.1987).

vices performed by the Corporation in connection with the movement of passengers or property by railroad were "casual" in nature, thereby, excepting the Corporation from Railroad Retirement Tax Act liability.

After careful consideration of the briefs filed by the parties, the oral argument held on the cross-motions for summary judgment, and for the reasons stated below, the plaintiff's motion for summary judgment is, hereby, GRANTED. The defendant's cross-motion for summary judgment, and partial motion for summary judgment are, therefore, DENIED.

### FACTS

Based on a thorough review of the documentation submitted by the parties, the facts of the case appear to be as follows. During the tax year at issue, 1979, the plaintiff, Union Pacific Corporation (the Corporation), owned, directly or indirectly, 100 percent of the common stock of thirty-six (36) subsidiaries, including four major operating companies engaged in transportation, energy and natural resources activities. In 1979, the four major operating companies of the Corporation were: (1) the Union Pacific Railroad (the Railroad), a transportation system which, in 1979, was active as a handler of grain, coal and other bulk commodities; (2) Champlin Petroleum Company, an integrated petroleum company engaged in the exploration, production, refining, transportation and marketing of oil and natural gas and other petroleum products; (3) Rocky Mountain Energy Company, a mining company which, in 1979, mined and produced uranium, natural soda ash and low sulfur coal; and (4) Upland Industries Corporation, a real estate development and land management company responsible for industrial property held for sale or lease, and the custodian of 1.2–million acres of land owned by the Corporation and 7–million additional acres to which the Corporation held mineral rights in 1979. Because this case involves the relationship between the Corporation and the Railroad, specifically, whether, in 1979, the Corporation and the Railroad were under "common control" and, if so, whether the Corporation provided services to the Railroad "in

connection with" railroad transportation, under the terms of section 3231(a) of the Internal Revenue Code of 1954, 26 U.S.C. § 3231(a), the development of the parent-subsidiary relationship and the ties between the two companies during the 1979 tax year require careful examination.

The roots of the Corporation can be traced to when the Union Pacific Railroad Company, headquartered in Omaha, Nebraska, created a New York office to serve as a financial headquarters and meeting place for the Railroad's Board of Directors. On February 3, 1969, in an effort to develop diversification in non-transportation ventures and to facilitate organization of the Railroad's non-transportation holdings, the Railroad split away its general office in New York City and incorporated it as the Union Pacific Corporation. During the course of the next several years, the Union Pacific Corporation was expanded to fulfill overall leadership responsibility for direction and review of subsidiary and affiliated companies and for the future acquisition of additional companies.

Several transactions between the Railroad and the Corporation, which took place during the period preceding the tax year in question, are pertinent to an examination of the parent-subsidiary relationship the two companies shared in 1979, the tax year presently at issue. On May 2, 1969, as the result of a reorganization accomplished by means of an exchange of securities, the Union Pacific Corporation became the parent holding company of Union Pacific Railroad Company. The reorganization resulted in the acquisition by the Corporation of 94.2 percent and 90.7 percent, respectively, of the outstanding Railroad Common and Preferred Stocks. At the time of such acquisition, the Railroad and its subsidiaries were engaged in transportation, natural resources (oil, gas and hard minerals), real estate development, and the Railroad held mineral interests in substantial undeveloped acreage in the Western part of the United States. Approximately two years later, on June 24, 1971, the Corporation acquired the remaining publicly held stock of the Railroad, making the Railroad a

wholly-owned subsidiary of the Corporation.

During the intervening years, between May 2, 1969 and June 24, 1971, another set of transactions took place which affected the nature of the parent-subsidiary relationship shared by the Railroad and the Corporation in 1979. On January 1, 1970, the Railroad purchased Champlin Petroleum Company and, thereby, substantially expanded its oil and gas operations. On June 1, 1970, all of the Railroad's existing oil and gas interests were placed under Champlin's management. The Railroad's remaining non-transportation operations and holdings in the areas of oil and gas, hard minerals and real property were transferred to the Union Pacific Development Corporation, another subsidiary of the Railroad, in April 1971. The common stock of the Union Pacific Development Corporation was, in turn, transferred to the Union Pacific Corporation on June 26, 1971, by means of a dividend.

Beginning in 1969, new management personnel, including a new President, Vice President–Finance, Treasurer, Controller and other professionals, were brought to the Corporation to staff the new holding company. From 1969 through 1971, the Railroad compensated the directors and all of the employees of the Union Pacific Corporation. Following the completion of the reorganization and creation of the Corporation and its operating subsidiaries, the management of the Corporation decided that it was then appropriate to transfer certain officers and other employees to the payroll of the Corporation.[2] The transfer of employees was made as of January 1, 1972, coinciding with the beginning of the Corporation's first year as a fully-functioning holding company. Although the officers of the Corporation were paid by the Railroad until 1971, during the period between 1965 and 1979, the Corporation reimbursed the Railroad for the costs of maintaining the Corporation.

In 1979, the tax year presently at issue, the Corporation clearly operated as a "management holding company," and concentrated its management efforts in those areas in which centralization optimized available business development opportunities. As a holding company, the Corporation controlled all of its subsidiaries, including the Railroad. While this does not mean that individuals employed by the Corporation were involved in the day-to-day operations of the Corporation's many subsidiaries, it does mean that the Corporation participated in major business decisions involving the subsidiaries.

The parties seem to agree that the activities or functions listed below were performed by the Corporation in its capacity as the holding company of the Railroad during the 1979 tax year, however, they disagree as to the nature, characterization and significance of most of the activities. Specifically, the parties disagree as to whether the listed activities were performed by the Corporation in a managerial capacity for the Railroad and, therefore, should be classified as "services" for the purposes of the definition included in section 3231(a) of the Code, as the defendant argues, or, whether the activities were inherent to a holding company's monitoring and oversight of a subsidiary, as the plaintiff maintains. The activities or functions performed by the Corporation during the 1979 tax year, as listed by the parties, were:

(a) *Review of Local and State Taxes* — The Corporation maintained a tax department which oversaw the filing of certain state and local tax returns. With respect to state property taxes, the Corporation prepared renditions and pursued protests, appeals, and litigation for all of the subsidiaries. With respect to state income tax returns, the Corporation prepared state income tax returns which were filed on a consolidated or combined basis, based on data submitted by the subsidiaries. With respect to sales and use taxes, the Corporation was responsible for all examinations

**2.** Although five officers of the Corporation remained on the Railroad payroll until 1974 so that they could qualify for benefits under the

Railroad Retirement Act, during the 1979 tax year, it appears that no officers remained on the Railroad payroll.

and questions raised by state and local authorities.

(b) *Equipment Trust Financing* —The Corporation arranged financing through the establishment of equipment trusts which were set up in the name of the Railroad. The Corporation was responsible for establishment of the trust, including preparation of the legal documents, the sale of the trust certificates, the release of the mortgages on trust equipment, and the recording of the trust agreement with the Interstate Commerce Commission. The Corporation was also responsible for overseeing the trustee and the management of the equipment trusts.

(c) *Internal Auditing* —The defendant argues that the Corporation maintained a corporate audit staff which performed comprehensive financial audits of all of its operating subsidiaries. The plaintiff, however, maintains that corporate auditing was not performed as a service for the Railroad. Rather, the plaintiff argues that corporate auditing was performed by the Corporation in its holding company capacity, and, in addition, the Railroad had its own auditing department. The plaintiff also contends that the Corporation's audit function was created after the Corporation was established to monitor subsidiary performance.

The parties agree that the corporate auditors verified the reliability of the subsidiaries' accounts and financial records as well as related statements and reports. The corporate auditors also examined the adequacy of financially related controls. Corollary objectives of the corporate auditors included the detection of fraud, the appraisal of the quality of subsidiary financial work, and the development of young professionals for financial management and specialist positions.

(d) *Advice on Various Tax Issues* —The Corporation responded to the subsidiaries' inquiries on the interpretations of federal tax laws and prepared opinions on various federal tax matters. The Corporation paid federal taxes on a consolidated basis (including the Railroad's), but the Railroad prepared and submitted a subsidiary tax return to the Corporation. The Corporation filed IRS administrative appeals and any suit for the redetermination of federal taxes.

(e) *Advice on Non–Tax Legal Issues* — The Corporation's attorneys monitored the subsidiaries' non-tax legal matters, including pending legislation which might affect the Corporation's interests. The legal department reviewed abandoned property laws and monitored divestitures, mergers, and the largest lawsuits filed against its subsidiaries.

(f) *Management of the Union Pacific Foundation* —The Corporation managed the Union Pacific Foundation, which made certain philanthropic contributions to charities recommended by its subsidiaries. These contributions were made in the name of the subsidiaries. Plaintiff claims that the subsidiaries also maintained their own, independent charitable programs.

(g) *Strategic Planning* —The Corporation maintained a strategic planning department that oversaw the development of the long-range corporate plans of the Corporation and its subsidiaries. The Corporation screened the plans submitted by its subsidiaries for opportunities for long-range purchases and expansions. The defendant argues that, as part of this process, the Corporation allocated capital resources. The plaintiff, however, maintains that the Corporation did not allocate capital resources as part of this process.

(h) *Centralized Cash Management* — The Corporation maintained a centralized cash management function. The Corporation allocated its corporate funds among its subsidiaries and determined the manner in which corporate assets were invested. The Corporation also determined how to invest all of the funded corporate plans.

(i) *Negotiations of Acquisitions or Mergers* —The Corporation often negotiated the financial terms of major acquisitions, divestments, financing, and mergers for the subsidiaries.

(j) *Establishment of Capital and Operating Budgets* —Although the Corporation annually approved all capital and operating

budgets of the subsidiaries, the plaintiff asserts that the Corporation's approval of subsidiary operating budgets was not a service performed for the Railroad. The plaintiff maintains that a formal budgeting and review process was created by the Corporation in order to permit it to monitor its subsidiaries' performance and financial needs in its holding company capacity.

(k) *Approval of Capital Expenditures* —The Corporation's officers, in their capacity as officers of the Railroad, approved Authorities for Expenditures over a certain amount. Certain Authorities for Expenditures were to be approved by the Railroad's Board of Directors.

In 1979, the president of the Railroad could approve the disposition of personal property valued at $500,000 or less, the disposition of land valued at $500,000 or less, capital budget items of $1–million and/or less, and non-budget items of $500,-000 or less. If the Railroad were the lessee under a lease, the Railroad's president could approve lease payments of $500,000 or less; if the Railroad were the lessor under a lease, the Railroad's president could approve expenditures of $50,000 or less.

The plaintiff argues that the Corporation's role in approving proposed capital expenditures was not a service for the Railroad. The expenditure review process was, the plaintiff maintains, established by the holding company in order to allow it to monitor subsidiary performance and financial requirements.

(*l*) *Inspection of Railroad Facilities* — In 1979, the Corporation's officers made rail trips to inspect the Railroad's facilities and equipment. The plaintiff asserts that inspections of Railroad facilities by Corporation officers was not a service for the Railroad, rather, a monitoring and oversight function for the holding company. The plaintiff maintains that such inspections did not affect the Railroad's management of its own operations or supplant the Railroad's own inspections for management purposes.

(m) *Press Relations* —The Corporation issued certain press releases on behalf of its subsidiaries and answered some inquiries from the media concerning all aspects of the Corporation's business. Again, the plaintiff argues that the issuance of press releases "on behalf of the subsidiaries," when performed, was only a mechanical function. The plaintiff maintains that the Railroad had its own press relations service, which was responsible for the Railroad's communications with the media.

(n) *Monitoring of Legislative Affairs* — Through its Washington Affairs office, the Corporation monitored the progress of all federal legislation affecting the Railroad and other subsidiaries. The Corporation prepared position papers on pending legislation and advised the subsidiaries on the effect of changes in federal law. The Corporation also maintained a liaison with the American Association of Railroads ("AAR") and assisted in the preparation of legal positions on behalf of the railroad industry. The Corporation's officers served on various AAR committees, such as the legal affairs committee. The plaintiff, however, adds that the Railroad also monitored legislation, prepared position papers and offered advice concerning the effects of changes in federal law.

(*o*) *Administration of Pension and Insurance Plans* —The Corporation was responsible for the administration of qualified plans covering generally all non-union employees, including the Railroad's non-union employees. The Corporation was responsible for the design and development of the plans, for obtaining approval from the Internal Revenue Service concerning the tax qualification of the plans, and for amending the plans to comply with federal law. The Corporation maintained a pension plan, a supplemental pension plan, a thrift plan, stock option plans, an executive incentive plan and a Trasop. The Corporation was also responsible for the administration of the corporate health insurance and disability plans and for approving executive compensation over a certain amount.

(p) *Investor Relations* —The Corporation was responsible for maintaining the minutes of the Railroad's Board of Di-

rectors meetings. The Corporation was also responsible for individual stockholder relations, preparation of proxies, selection of a transfer agent, and the annual meetings. The plaintiff points out that the Railroad did not have stock in the hands of the public and, therefore, had no reason to perform such activities.

(q) *Preparation and/or Review of Annual Filings with Government Agencies* —The Corporation was responsible for the preparation of the annual report and the filing of that report with the Securities and Exchange Commission. Plaintiff observes that as a publicly-held company, the Corporation was required to file the report; the Railroad, a wholly-owned subsidiary of the Corporation, was not. The Railroad was required to file its own annual report with the Interstate Commerce Commission, which the Railroad prepared and submitted on its own.

(r) *Preparation of Wage and Price Control Guidelines* —In 1979, the Corporation was responsible for the preparation of guidelines for and the monitoring of salary increases under the procedures established with the Council on Wage and Price Stability ("COWPS"). The Corporation was also responsible for filing proof of compliance with COWPS. The plaintiff argues that under procedures established by COWPS, the Corporation was required to file reports and prepare guidelines for the entire corporate family.

(s) *Occasional Use of the Corporation's Corporate Jets* —The Corporation occasionally allowed Railroad employees to use its corporate jets when flying out of town on business. The plaintiff maintains that this was simply a reciprocal arrangement whereby Corporation employees sometimes used the Railroad's jets when flying on business.

In addition to the above activities or functions performed by the Corporation in 1979, the parties have identified other links between the Corporation and the Railroad. In 1979, some of the officers of the Corporation held dual titles as officers of the Railroad and these same officers had approval authorization for expenditures submitted by the Railroad, although, as is discussed more fully below, the parties dispute the degree of supervisory power of the dual title individuals over the Railroad and its employees. In 1979, the tax year at issue, however, only the Corporation compensated these dual title employees.

Also during the tax year at issue, 1979, the board of directors of the Union Pacific Corporation and the board of directors of the Railroad were essentially composed of the same individuals. In 1979, all of the individuals who served on the Railroad's board of directors also served on the Union Pacific Corporation's board of directors, and only two of the twenty individuals on the Union Pacific Corporation's board of directors did not also serve on the Railroad's board of directors.

## DISCUSSION

Summary judgment in the United States Claims Court is properly granted only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Rule 56 of the Rules of the United States Claims Court (RUSCC) is patterned on Rule 56 of the Federal Rules of Civil Procedure (Fed. R.Civ.P.) and is similar in language.[3] Both Rules provide that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." RUSCC 56(c); Fed.R.Civ.P. 56(c). Rule 56(c) of the Rules of the United States Claims Court provides that in order for a motion for summary judgment to be granted, the moving party bears the burden of showing that there is

---

**3.** In general, the Rules of the United States Claims Court (RUSCC) are closely patterned upon the Federal Rules of Civil Procedure (Fed. R.Civ.P.). Therefore, precedent under the Fed. R.Civ.P. is relevant to interpreting the RUSCC, including RUSCC 56(c). *See Imperial Van Lines Int'l, Inc. v. United States,* 821 F.2d 634, 637 (Fed.Cir.1987); *Lichtefeld–Massaro, Inc. v. United States,* 17 Cl.Ct. 67, 70 (1989).

no genuine issue of material fact and is entitled to judgment as a matter of law. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Rust Communications Group, Inc. v. United States*, 20 Cl.Ct. 392, 394 (1990); *Lima Surgical Assoc., Inc. Voluntary Employees' Beneficiary Assn. Plan Trust v. United States*, 20 Cl.Ct. 674, 679 (1990), *aff'd*, 944 F.2d 885 (Fed.Cir.1991).

As stated in *Webster University v. United States*, 20 Cl.Ct. 429 (1990):

An issue is genuine only if, on the entirety of the record, a reasonable jury could resolve a factual matter in favor of the non-movant, *see, e.g., Sweats Fashions, Inc. v. Pannill Knitting Co.*, 833 F.2d 1560, 1562 (Fed.Cir.1987), while the materiality of a fact is determined by reference to applicable legal standards. *Id.*, 833 F.2d at 1567.

*Id.* at 432 (emphasis deleted). Disputes over facts which are not outcome determinative under the governing law will not preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Summary judgment will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.; see also Uniq Computer Corp. v. United States*, 20 Cl.Ct. 222, 228–29 (1990). The nonmovant must do more than merely raise some doubt as to the existence of a fact; the nonmovant must make a showing sufficient to require submission of the factual dispute to a jury or judge. *Avia Group Int'l, Inc. v. L.A. Gear California, Inc.*, 853 F.2d 1557 (Fed.Cir.1988).

Moreover, the facts presented must be viewed in the light most favorable to the nonmoving party. *Adickes v. Kress & Co.*, 398 U.S. at 147, 90 S.Ct. at 1602. If the moving party has carried its initial burden of showing that there is no genuine issue of material fact, then the nonmoving party bears the burden to present "specific facts showing that there is a genuine issue for trial." RUSCC 56(f); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248, 106

S.Ct. at 2510 (citing *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)); *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). The nonmovant "must proffer countervailing evidence sufficient to create a genuine issue of material fact". *Uniq Computer*, 20 Cl.Ct. at 228. The party opposing the motion must "prove by sufficient evidence that a genuine issue of material fact positively remains." *Spirit Leveling Contractors v. United States*, 19 Cl.Ct. 84, 89 (1989).

When making a summary judgment determination, the judge's function is not to weigh the evidence, but to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 249, 106 S.Ct. at 2510; *see, e.g., Cloutier v. United States*, 19 Cl.Ct. 326, 328 (1990), *aff'd*, 937 F.2d 622 (Fed.Cir.1991). The judge must determine whether the evidence presents a sufficient disagreement to require submission to fact finding, or whether it is so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 250–52, 106 S.Ct. at 2511–12. When the record could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial, and the motion must be granted. *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. at 587, 106 S.Ct. at 1356. If, however, the nonmoving party produces sufficient evidence to raise a question as to the outcome of the case, then the motion for summary judgment should be denied. As indicated above, any doubt over factual issues must be resolved in favor of the party opposing summary judgment, to whom the benefit of all presumptions and inferences runs. *Id.; see also Litton Industrial Products, Inc. v. Solid State Systems Corp.*, 755 F.2d 158, 163 (Fed.Cir.1985); *H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1574 (Fed. Cir.1984), *cert. denied*, 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985).

In *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), the Supreme Court added an additional pro-

vision to the long standing summary judgment guidelines outlined above when it indicated that the initial burden on the party moving for summary judgment to produce evidence showing the absence of a genuine issue of material fact may be discharged, if the moving party can show, alternatively, that there is an absence of evidence to support the nonmoving party's case. *Id.* at 325, 106 S.Ct. at 2553; *see also Lima Surgical Assoc.,* 20 Cl.Ct. at 679. If the moving party makes this showing, the burden is then on the nonmoving party to present evidence in support of its case and show that a genuine factual dispute exists by making a showing sufficient to establish the existence of an element of its case upon which it bears the burden of proof. *Lima Surgical Assoc.,* 20 Cl.Ct. at 679. The logic behind this addition is simple. If under no scenario can the nonmoving party present the necessary evidence to support its case, then there should be no genuine need for the parties to undertake the time and expense of a trial, and the moving party should prevail without further proceedings. Under Rule 56, the motion for summary judgment may be made by the moving party and succeed, whether or not accompanied by affidavits and other documentary evidence in addition to the pleadings already on file. Generally, however, in order to prevail, the nonmoving party will need to go beyond the pleadings, by use of evidence such as affidavits, depositions, answers to interrogatories and other admissions, in order to show that a genuine issue for trial exists. *Celotex v. Catrett,* 477 U.S. at 324, 106 S.Ct. at 2553. The type of evidence provided by the party opposing summary judgment need not meet the standards for admissibility at trial. The nonmovant, however, must produce evidence beyond the mere pleadings to survive the summary judgment motion and proceed to trial. *Id.*

The fact that both parties have moved for partial or full summary judgment, based on the alleged absence of genuine issues of material fact, does not relieve the court of its responsibility to determine the appropriateness of summary disposition in the particular case. *Prineville Sawmill*

*Co. v. United States,* 859 F.2d 905, 911 (Fed.Cir.1988) (citing *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1391 (Fed.Cir.1987)); *Levine v. Fairleigh Dickinson Univ.,* 646 F.2d 825, 833 (3d Cir.1981) (holding that it is inappropriate to conclude that because both sides moved for summary judgement that both concede that the case is ready for disposition); *Home Ins. Co. v. Aetna Cas. & Sur. Co.,* 528 F.2d 1388, 1390 (2d Cir.1976); *LewRon Television, Inc. v. D.H. Overmyer Leasing Co.,* 401 F.2d 689, 692–93 (4th Cir.1968), *cert. denied,* 393 U.S. 1083, 89 S.Ct. 866, 21 L.Ed.2d 776 (1969). Cross-motions are no more than a claim by each party that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not establish that if one is rejected the other is necessarily justified. *Rains v. Cascade Indus., Inc.,* 402 F.2d 241, 245 (3d Cir.1968). The court must evaluate each party's motion on its own merits, taking care to draw all reasonable inferences against the party whose motion is under consideration. *Mingus Constructors, Inc. v. United States,* 812 F.2d at 1391.

To be liable for railroad employment taxes under Chapter 22 of the Internal Revenue Code (the Railroad Retirement Tax Act), the Corporation, during the 1979 tax year, must have qualified as an "employer" under the definition included in section 3231(a) of the Code. 26 U.S.C. § 3231(a). Section 3231(a) reads, in pertinent part:

(a) Employer.

For purposes of this chapter, the term "employer" means any carrier (as defined in subsection (g)), and any company which is directly or indirectly owned or controlled by one or more such carriers or under common control therewith, and which operates any equipment or facility or performs any service (except trucking service, casual service, and the casual operation of equipment or facilities) in connection with the transportation of passengers or property by railroad, or the receipt, delivery, elevation, transfer in transit, refrigeration or icing, storage,

or handling of property transported by railroad ...

26 U.S.C. § 3231(a).

For the definition of "carrier," as used in section 3231(a), the reader is referred to section 3231(g):

> For purposes of this chapter, the term "carrier" means an express company, sleeping car carrier, or rail carrier providing transportation subject to Subchapter I of Chapter 105 of Title 49.

26 U.S.C. § 3231(g).

In order to ascertain whether the Corporation is subject to the Railroad Retirement Tax Act for the 1979 tax year, the court, therefore, must first determine whether the Corporation was (1) a "carrier," (2) "a company directly or indirectly owned or controlled by one or more carriers," or (3) a company "under common control" with a carrier.

In the instant dispute, the defendant has not argued that the Corporation was a "carrier," as defined in section 3231(g) of the Code.[4] Both parties, however, concede that the Railroad was a carrier within the meaning of section 3231(g) of the Code during 1979. Moreover, the defendant has not asserted that the Corporation was "directly or indirectly owned or controlled by" a carrier. In fact, the situation was quite the reverse. Any ownership and control which existed was that of the Corporation over the Railroad, just as the Corporation owned and controlled its other subsidiaries engaged in non-transportation operations.

The crux of the instant debate revolves around the defendant's claim that during the tax year at issue, 1979, the Corporation was "under common control" with its wholly-owned subsidiary, the Railroad. The defendant seeks to prove the existence of "common control" of the Corporation and the Railroad by advancing three propositions. First, the defendant maintains that it is obvious that a subsidiary corporation is "under common control" with its parent corporation. The defendant argues that the parent corporation controls the subsidiary, and the parent is controlled by its stockholders. Thus, the defendant maintains, the stockholders of the parent company control both companies. In other words, the defendant asserts that the Union Pacific Corporation and the Railroad were "under common control" of the Union Pacific Corporation's stockholders during the 1979 tax year.

Second, the defendant contends that common control also is established by the fact that in 1979, all of the individuals who served on the board of directors of the Railroad also served on the board of directors of the Corporation. Therefore, the defendant argues that in 1979 the Corporation and the Railroad were "under common control" of the eighteen individuals who served on both boards of directors.

Third, because some of the officers of the Corporation were also officers of the Railroad during the 1979 tax year, the defendant maintains that the Corporation and the Railroad were "under common control" of those officers of the Corporation. The defendant argues that the purpose for these dual titles was to allow the officers of the Corporation to supervise directly the activities of the Railroad and other subsidiaries of the Corporation. Therefore, according to the defendant, the officers of the Corporation exercised "common con-

---

**4.** The Interstate Commerce Commission (ICC) has repeatedly classified the Union Pacific Corporation as a parent company governed by 49 U.S.C. § 11348 (1988) and subject only to limited Interstate Commerce Act jurisdiction. *See, e.g., Union Pacific—Control—Missouri Pacific; Western Pacific,* 366 I.C.C. 459, 473 (1982) ("UPC [Union Pacific Corporation] is a noncarrier holding company with subsidiaries engaged in railroad operations, real estate and land development, energy and natural resource development"), *aff'd sub nom., Southern Pacific Transportation Co. v. I.C.C.,* 736 F.2d 708 (D.C.Cir. 1984), *cert. denied,* 469 U.S. 1208, 105 S.Ct. 1171, 1172, 84 L.Ed.2d 322 (1985). In fact, the Corporation was determined to be a holding company as early as 1976. *See Investigation Into the Management, Business Interrelationships and Transactions of the Below–Named Railroads, their Controlling Holding Companies and Affiliated Companies,* Ex Parte No. 323 (unpublished decision served Mar. 19, 1976). And the Corporation continued to be classified as a non-carrier holding company as recently as 1986. *Union Pac. Corp.—Control—Overnite Transp. Co.,* Finance Docket No. 31000 (Sub–No. 1) (unpublished decision served Dec. 9, 1986).

trol" over both the Railroad and the Corporation.

The plaintiff, on the other hand, argues that section 3231(a) of the Code includes within the term "employer" those companies providing transportation services which are carriers, direct or indirect subsidiaries of carriers or under common control with carriers. However, the plaintiff argues that the Union Pacific Corporation, the plaintiff herein, and the Railroad are not "under common control" because the Corporation, as the corporate parent, controls the Railroad. According to the plaintiff, the most that could be said of the relationship between the Corporation and the Railroad in 1979 was that the numerous subsidiaries of the Corporation engaged in non-transportation operations were "under common control" with the Railroad and that the only common control was that exercised by the Corporation over its multiple subsidiaries.

The case as presented to the court is one of statutory interpretation. The dispute between the parties is clear. The court must determine whether the Union Pacific Corporation was "under common control" with its wholly-owned carrier subsidiary, the Union Pacific Railroad, during the 1979 tax year.

"The starting point in every case involving construction of a statute is the language itself." *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 756, 95 S.Ct. 1917, 1935, 44 L.Ed.2d 539, *reh'g denied*, 423 U.S. 884, 96 S.Ct. 157, 46 L.Ed.2d 114 (1975); *see also Watt v. Alaska*, 451 U.S. 259, 265, 101 S.Ct. 1673, 68 L.Ed.2d 80 (1981). "A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, and common meaning." *Perrin v. United States*, 444 U.S. 37, 42, 100 S.Ct. 311, 314, 62 L.Ed.2d 199 (1979) (citing *Burns v. Alcala*, 420 U.S. 575, 580–81, 95 S.Ct. 1180, 1184–85, 43 L.Ed.2d 469 (1975)). " 'The legislature must be presumed to use words in their known and ordinary signification.' " *Old Colony Railroad Co. v. Commissioner,*

284 U.S. 552, 560, 52 S.Ct. 211, 213, 76 L.Ed. 484 (1932) (quoting *Levy's Lessee v. McCartee*, 31 U.S. (6 pet.) 102, 110, 8 L.Ed. 334 (1832)). The court may not substitute its judgement for that of Congress as to the best means for achieving a purpose. *Greenville Steel Car Co. v. United States*, 222 Ct.Cl. 400, 405, 615 F.2d 911, 914 (1980); *see also United States v. Calamaro*, 354 U.S. 351, 357, 77 S.Ct. 1138, 1142, 1 L.Ed.2d 1394 (1957). " '[T]he plain, obvious and rational meaning of a statute is always to be preferred to any curious, narrow, hidden sense that nothing but the exigency of a hard case and the ingenuity and study of an acute and powerful intellect would discover.' " *Lynch v. Alworth–Stephens Co.*, 267 U.S. 364, 370, 45 S.Ct. 274, 276, 69 L.Ed. 660 (1925) (quoting *Lynch v. Alworth–Stephens Co.*, 294 Fed. 190, 194 (8th Cir.1923)); *see also Old Colony Railroad v. Commissioner*, 284 U.S. at 560, 52 S.Ct. at 213.

Moreover, where there is a reasonable doubt as to the meaning of a taxing statute, it should be construed in the light most favorable to the taxpayer. *Gould v. Gould*, 245 U.S. 151, 153, 38 S.Ct. 53, 53, 62 L.Ed. 211 (1917). " 'Tax laws, like all other laws, are made to be obeyed. They should therefore be intelligible to those who are expected to obey them.' " *White v. Aronson*, 302 U.S. 16, 20–21, 58 S.Ct. 95, 97, 82 L.Ed. 20 (1937) (quoting *Philadelphia Storage Battery Co. v. Lederer*, 21 F.2d 320, 321–22 (E.D.Pa.1927)). Furthermore, when a principle of tax law requires reexamination, Congress is better equipped than a court to define precisely the type of conduct which results in tax consequences. *Hardee v. United States*, 708 F.2d 661, 664 (Fed.Cir.1983) (citing *United States v. Byrum*, 408 U.S. 125, 135, 92 S.Ct. 2382, 2389, 33 L.Ed.2d 238 (1972)).

█ In the instant dispute, the critical phrase requiring interpretation included in section 3231(a) of the Railroad Retirement Tax Act is "under common control." A company which controls another is not "under common control" with the second com-

pany.[5] Necessary to a finding of common control is the existence of corporate entities which exercise shared control over each other, or corporate entities which are in parallel position, both controlled by a single additional corporate entity, such as subsidiaries owned by a common parent. A parent company of a wholly-owned subsidiary clearly does not share control with its subsidiaries.

In taking the position that the existence of dual directors and officers establishes that the Corporation was under common control with the Railroad, the defendant is ascribing to the individual corporate officers involved a heightened status as independent from the Corporation they serve, which is not justified. The individuals who serve as directors of a corporation, whether it be a parent or subsidiary, are fiduciaries and act only in representative capacities for the particular corporate entity on behalf of which they are acting at the time.[6] When individuals act as directors of the Corporation they act in a capacity different from that in which they act as directors of the Railroad. When they act as directors of the Corporation, they act as the representatives of the Corporation's public shareholders. When they act as directors of the Railroad, they act as the representatives of the Railroad's sole shareholder, the Corporation. In either case, they are not called upon to act as representatives of themselves. As individuals, they have no independent significance and are not exercising control in their own interests. They are not exercising common control, when they act, not for themselves, but in different capacities, and with different responsibilities when they act as directors of the Corporation or as directors of the Railroad.[7]

■ The defendant, in its brief, seems to misconceive the very nature, function and relationship of a parent holding company and its subsidiary. The Supreme Court has stated that:

> [t]he dominant characteristic of a holding company is the ownership of securities by which it is possible to control or substantially to influence the policies and management of one or more operating companies in a particular field of enterprise.... But the concentrated ownership of voting securities is the prime method of achieving control, constituting a more fundamental part of holding companies than of other types of business.

*North American Co. v. Securities & Exchange Commission*, 327 U.S. 686, 701, 66 S.Ct. 785, 794, 90 L.Ed. 945 (1946) (footnote omitted). The term "subsidiary corporation" has been defined as "one in which another corporation owns at least a majority of the shares and thus has control." 6A W. Fletcher, *Cyclopedia of the Law of Private Corporations* § 2821 (rev. perm. ed. 1989). For there to be common control between the parent and the subsidiary, the subsidiary would also have to be in a position to exercise voting control concerning the affairs of the parent, which is clearly not the case regarding the plaintiff and its railroad subsidiary.

■ Notwithstanding the fact that two corporations are in a parent-subsidiary relationship, each is deemed to have a separate corporate existence. The holding company is not merged or consolidated with the companies whose stock it owns in whole or in part; the separate existence of each of the companies continues and neither the holding company nor the subsidiary lose their

---

**5.** The phrase "under common control" does not provide a natural description of a parent and its subsidiary because the word "common" conveys a sense of equality. For example, *Webster's New International Dictionary* defines "common" as "[s]hared equally or similarly by two or more individuals...." *Webster's New International Dictionary* 539 (2d ed. 1951).

**6.** The directors of a subsidiary must "give their best judgment to the interest of their corporation," not "for the benefit of the holding company." 3 W. Fletcher, *Cyclopedia of the Law of*

*Private Corporations* § 1012 (rev. perm. ed. 1986) (footnote omitted).

**7.** This may be illustrated by examining what the result would be if the Corporation and the Railroad had no dual directors or officers. In this situation, there would be no individual to whom to point as the entity exercising common control. The only relationship between the Corporation and the Railroad would be that the Railroad was wholly-owned by the Corporation. The most that could be said would be that the Corporation owned (or controlled) the Railroad.

separate identity. A holding company has a separate corporate existence, and it continues to be treated as a separate entity for tax purposes, unless such corporate existence and services performed, one for the other, can be demonstrated to be a mere sham, or have been used as an instrument for concealing the truth, or where the organization and control are shown to be but an instrumentality or adjunct of another corporation designed to avoid tax responsibilities.[8] *See Standard Office Building Corporation v. United States*, 819 F.2d 1371, 1378 (7th Cir.1987). Moreover, a holding company is generally held not to be doing or transacting business through its subsidiary where the separate corporate entities are maintained. 6A W. Fletcher, *Cyclopedia of the law of Private Corporation* § 2821 rev. perm. ed. 1989). Also important is the fact that although several corporations have the same stockholders or officers, or both, their several identities are not destroyed. *Id.*

■ As a holding company, the Union Pacific Corporation controlled all of its subsidiaries, including the Railroad. This does not mean that the individuals employed by the Corporation were involved in the day-to-day operations of each of the subsidiaries. Rather, the employees of the parent Union Pacific Corporation appear to have been involved in major planning and business decisions and in oversight functions involving all the subsidiaries. For example, major acquisitions or capital expenditures by a subsidiary were approved by the Corporation. Similarly, the annual capital and operating budgets for each subsidiary were approved by the Corporation, and the Corporation determined how to allocate the total funds available to the Corporation among the various subsidiaries.

While it is true that in 1979 there were individuals who were officers of both the Corporation and the Railroad, in their former capacity, they appear to have performed oversight and planning duties for the Railroad, such as signing financial agreements and occasionally preparing routine reports for appropriate government agencies, presiding over or attending occasional meetings, and similar, noncontinuous actions having no significant bearing or effect on day-to-day functioning of the Railroad in the conduct of its ongoing business. *See Peterson v. Chicago, Rock Island & Pac. Ry.*, 205 U.S. 364, 391, 27 S.Ct. 513, 522, 51 L.Ed. 841 (1907). As John C. Kenefick, President and, later, Chairman of the Railroad from 1971 until 1986, stated in his affidavit:

> As everyone at UPC [the Union Pacific Corporation] knew, I ran my own shop at the Railroad and it was known that I considered UPC to be more of a nuisance than a source of direction. The idea that UPC directly managed the Railroad or told us how to run our business during my years at the Railroad is wrong.
>
> \*　\*　\*　\*　\*　\*
>
> The creation of a holding company above the Railroad meant that the Railroad had to provide more information to New York, but it did not reduce our authority in Omaha to run the Railroad. We ran the railroad from Omaha. Our management was fully capable of operating one of the largest railroads in the country, and we did so successfully throughout my tenure.
>
> \*　\*　\*　\*　\*　\*
>
> We had a complete staff of senior officers on the Railroad, including not only a President but Vice Presidents supervising major departments responsible for operations, traffic (marketing), labor re-

---

**8.** According to the Proxy Statement issued by the Union Pacific Railroad Company on June 1, 1971, the principal reason for setting up the Corporation in the holding company structure was to facilitate diversification and develop the non-transportation assets and business. There is no suggestion in the record, nor does the defendant seem to imply, that the Corporation was organized as a holding company in order to avoid the burden of the Railroad Retirement

Tax Act. The possibility of saving Railroad Retirement Tax dollars certainly was not a motivating factor when the Railroad reorganized to create the Union Pacific Corporation. As stated by Edward R. Hill, Vice President—Financial Administration for the Corporation, in his affidavit, "[t]he amounts of money involved would have been insignificant compared to the scale of our non-transportation diversification and development...."

lations, law, finance and administration, and information and communications services. Those officers did not have supervisors at UPC. They reported only to me.

Perhaps the most important thing to understand about the Railroad–UPC relationship is the flow of direction and initiative between the two companies. It flowed from Omaha to New York. New York did not decide how the Railroad should be run and then issue instructions. Omaha determined what the Railroad should do and how it should be operated. In most areas, UPC had no interest at all in our decisions and no mechanism for expressing its views. If our decisions affected the corporate purse strings in some significant way, the Corporation reacted.

The dual titles of some of the Corporate officers appear to have had no day to day management significance. In fact, Mr. Kenefick even stated in his affidavit that:

I have been told that a UPC employee may have testified that the Railroad's Vice President–Finance report to UPC's Treasurer. If someone said that, he was wrong. The Railroad Vice Presidents reported to me.

In fact, although I was President of the Railroad for more than a decade and a half, I did not even know that many of these dual titles existed until I read the papers in this case. The Railroad titles existed so that UPC employees could sign financial papers for the Railroad in New York without having the documents sent to Omaha and back. However, if a Corporation employee had ever attempted to tell a Railroad employee what to do based on one of those dual titles, we would have straightened him out.

Finally, to hold that in 1979 there was common control between the Corporation and the Railroad would render meaningless that portion of the alternative definition included in section 3231(a) of the Code which defines ownership or control of a carrier. A statute or statutory phrase should not be construed in such a way as to render words which are included in a statute superfluous. *See, e.g., McDonald v. Thompson*, 305 U.S. 263, 266, 59 S.Ct. 176, 178, 83 L.Ed. 164 (1938), *reh'g denied*, 305 U.S. 676, 59 S.Ct. 356, 83 L.Ed. 437 (1939). In the Railroad Retirement Tax Act, Congress did not use the words "under common control" in isolation, but included it in a larger phrase that also contains additional related language referring to subsidiaries of carriers, i.e., *"any company which is directly or indirectly owned or controlled by one or more such carriers or under common control therewith."* (emphasis added). If Congress had meant "under common control" to include parent-subsidiary relationships, as the defendant argues, there would have been no need to specifically include the reference to companies "owned or controlled by" railroads or to choose the words "under common control" in the next portion of the phrase. Were the court to find that mere ownership of a subsidiary corporation constitutes common control, then the first reference in section 3231(a) to "any company which is directly or indirectly owned or controlled by one or more such carriers," which the defendant concedes is not the case here, would be superfluous, and the apparently deliberate congressional choice of the words "under common control" would be rendered null and void. The fact remains, however, that Congress did not choose to subject all companies related to railroads to the tax, but was content to impose the tax on companies "intimately related to the transportation of passengers or property by railroad in the United States." S.Rep. No. 818, 75th Cong., 1st Sess. 4 (1937), *reprinted in* 1939–2 C.B. 629, 632. Oversight by a parent holding company of a railroad subsidiary, which has independent control of its own day-to-day railroad operations does not constitute the kind of intimate relationship Congress intended as necessary to establish "common control."

"All laws are to be given a sensible construction. A literal application of a statute which would lead to absurd consequences is to be avoided whenever a reasonable application can be given which is consistent with the legislative purpose." *United States v. Ryan*, 284 U.S. 167, 175, 52 S.Ct.

65, 68, 76 L.Ed. 224 (1931). Common sense in the instant case dictates that the requirements for common control are an identity of ownership interest in two or more entities and the exercise of joint management control. In the above-captioned case, during the 1979 tax year, the most that can be argued is that all the subsidiaries of the Union Pacific Corporation, those engaged in non-transportation operations as well as the Railroad, were "under common control" with each other. By the words of 26 U.S.C. § 3231(a), the parent, Union Pacific Corporation was not in common control with its wholly-owned subsidiary the Union Pacific Railroad.

This court agrees with, and would expand on, the words of Judge Posner of the United States Court of Appeals for the Seventh Circuit when he wrote regarding the coverage of the Railroad Retirement Tax Act:

> The best approach in the circumstances, pending congressional or administrative revision or clarification of the statute ..., is one that will minimize corporate reorganizations designed to avoid railroad retirement tax liability and will protect reasonable expectations.

*Standard Office Bldg. Corp. v. United States*, 819 F.2d at 1379. This court is persuaded that 26 U.S.C. § 3231(a) should not be the force to cause unanticipated major corporate realignments of holding companies which have railroad subsidiaries. By the words of the statute, the plaintiff Corporation does not fall within the range of companies which are subject to pay Railroad Retirement Tax Act taxes pursuant to 26 U.S.C. § 3231(a). Moreover, the Corporation had no reason to develop its long range corporate planning as if it would be subject to Railroad Retirement Act tax liability.

The defendant attempts to support its position by referring to administrative interpretations, including regulations issued by the government, and to a memorandum issued by the Railroad Retirement Board, written by the Board's general counsel's office, titled: "Coverage of 'Employers,' 'Employee Representatives,' and 'Employees' under the Railroad Retirement Act of 1937 and Relation to Coverage Under the Railroad Unemployment Insurance Act." The regulations relied on by the defendant are:

§ 202.4 Control

A company or person is controlled by one or more carriers, whenever there exists in one or more such carriers the right or power by any means, method or circumstance, irrespective of stock ownership to direct, either directly or indirectly, the policies and business of such a company or person and in any case in which a carrier is in fact exercising direction of the policies and business of such a company or person.

20 C.F.R. § 202.4 (1938).

§ 202.5 Company or person under common control

A company or person is under common control with a carrier, whenever the control (as the term is used in § 202.4) of such company or person is in the same person, persons, or company as that by which such carrier is controlled.

20 C.F.R. 202.5 (1938).

The defendant argues that "[s]ince the shareholders and board of directors of UPC [the Corporation] directly control UPC and indirectly control the Railroad, within the meaning of 'control' set forth in § 202.4, common control as defined by § 202.5 is present." However, section 202.4 defines situations in which a company is "controlled" by a carrier, e.g., "A company or person is controlled by one or more carriers...." As previously discussed the defendant does not argue that the Corporation was a carrier during the 1979 tax year. Furthermore, the defendant has not asserted that the Corporation was directly or indirectly owned or controlled by a carrier. Therefore, given the facts of the present case, 20 C.F.R. § 202.4 does not even apply. "Control" as defined in section 202.4 applies to situations in which carriers own other companies, not in which other companies own carriers.

In addition, the definition of "common control" included in 20 C.F.R. § 202.5 does not, by its terms, address the parent-sub-

sidiary relationship. Rather, 20 C.F.R. § 202.5 establishes common control between sister corporations, namely a carrier and another corporation, both controlled by a parent corporation.

The defendant next quotes from a Railroad Retirement Board Memorandum in support of its interpretation of the phrase "under common control." The defendant, in its brief, quotes the following passage from the Board Memorandum:

a company need not be owned by a carrier if it is controlled by, or under common control with, one or more carrier employers. As in the case of ownership, control may be direct or indirect, depending upon whether or not intermediate companies or individuals are present in the chain of control from carrier employer to the company in question. The usual case of *common* control occurs when a carrier and the company in question are both controlled by a third company. *Common* control also exists in the rarer case where the company in question controls a carrier. There both the carrier employer and the company in question are under the common control of the latter company's board of directors. [Emphasis in original.]

However, the Railroad Retirement Board Memorandum also recognizes: "It was clearly the intent of Congress, in framing the Railroad Retirement Act, to make it applicable to the railroad industry *and those railroad subsidiaries* which are intimately connected with railroads in the conduct of railroad transportation" (emphasis added). Therefore, considering the defendant's quoted passage comes from a section of the Board Memorandum titled "Carrier Subsidiary Coverage," and in light of the Board's recognition that Congress intended to make the Act applicable to "railroad subsidiaries," this court does not

find the Memorandum supportive of the defendant's position. Furthermore, this Board Memorandum does not even have the force or effect of a regulation and clearly is not binding on this court. *See Stubbs, Overbeck & Assoc. v. United States*, 445 F.2d 1142 (5th Cir.1971).

This court finds that the statutory language which is at issue here, specifically, the definition of the term "employer," as used in section 3231(a) of the Railroad Retirement Tax Act, is not ambiguous, and resort to the legislative history should not be necessary. *See United States v. Turkette*, 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981); *Texas State Com for the Blind v. United States*, 796 F.2d 400, 406 (Fed.Cir.1986). However, even the legislative history further supports this court's conclusions. The definition of the term "employer," as used in section 3231(a) of the Railroad Retirement Tax Act, originated in the 1934 Railroad Retirement Act, Pub.L. No. 73–485, 48 Stat. 1283 (1934). The 1934 Railroad Retirement Act was designed to create a retirement system for employees of companies which performed services in connection with railroad transportation. The language incorporated into the 1934 Railroad Retirement Act was taken from the 1934 amendments to the Railway Labor Act of 1926, Pub.L. No. 73–442, 48 Stat. 1185 (1934), which had been passed six days earlier. *See* 48 Stat. 1283, § 1(a) (June 27, 1934). Shortly after its enactment, however, the Railroad Retirement Act of 1934 was declared unconstitutional in *Railroad Retirement Board v. Alton R. Company*, 295 U.S. 330, 55 S.Ct. 758, 79 L.Ed. 1468 (1935).[9] Nevertheless, the legislation later enacted as the Carriers' Taxing Act of 1937, Pub.L. No. 75–174, 50 Stat. 307, 435 (1937), now referred to as the Railroad Retirement Tax Act,[10] retained

---

**9.** The Supreme Court determined that, for among other reasons, the Railroad Retirement Act of 1934 was unconstitutional because it contained inseparable provisions which violated the due process clause, and because it was not, in purpose or effect, a regulation of interstate commerce within the meaning of Article I, § 8 of the Constitution. *Railroad Retirement Board v. Alton*, 295 U.S. at 362, 55 S.Ct. at 767. Subse-

quently, the Supreme Court modified its position in the *Alton* case in *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976).

**10.** The Carrier's Taxing Act was incorporated into the Internal Revenue Code in 1939 (*see* 53 Stat. 179 (1939)), and since 1946 has been referred to as the Railroad Retirement Tax Act.

the same pertinent statutory definitions at issue in the instant case, as those found in the Railroad Retirement Act of 1934.[11] *See Railroad Retirement Board v. Duquesne Warehouse Co.*, 326 U.S. at 451, 66 S.Ct. at 240. Therefore, the legislative history of the 1934 Railway Labor Act amendments is germane to this court's analysis of the legislative history of the 1937 Railroad Retirement Tax Act. *See Railroad Retirement Board v. Duquesne Warehouse Co.*, 326 U.S. at 451, 66 S.Ct. at 240.

The defendant argues that the development of the statutory definition of the term "employer" in section 3231(a) supports its view that the Congressional intent was to include within that definition the parent of a carrier, such as the Union Pacific Corporation. In its "Brief for the United States in Support of Its Cross–Motion for Summary Judgment and Response to Plaintiff's Motion for Summary Judgment," the defendant has tried to construe excerpts from the testimony of Joseph B. Eastman,[12] given before the Senate Committee on Interstate Commerce during its consideration of the proposed amendments to the Railway Labor Act of 1926 in an effort to support its argument that Congress intended to include parent corporations within the section 3231(a) definition of the term "employer." In its brief, the defendant quoted only

a selected segment of Mr. Eastman's remarks. According to the defendant:

> In a response to a question, Mr. Eastman agreed that the new statutory language, 'any company which is directly or indirectly owned or controlled by or under common control with any carrier by railroad,' referred to a 'parent, subsidiary, and affiliated [companies]' of a carrier.

Apparently, in its brief, the defendant was attempting to characterize Mr. Eastman's testimony as in agreement with defendant's position that the statutory definition of "carrier" [13] included a " 'parent' ... of a carrier." However, an examination of the full text of Mr. Eastman's testimony reveals not only that the defendant has mischaracterized Mr. Eastman's testimony, but also that it was Mr. Eastman's intent to limit the definition of "carrier" to include only "carriers and their subsidiaries engaged in transportation." The full text of Mr. Eastman's comments in this regard, taken from the Congressional Record, which are only paraphrased by the defendant in its brief, reads:

> Mr. EASTMAN..... It is difficult to know just where to draw the line. *I am inclined to believe that for the present it would be well not to go beyond carriers and their subsidiaries engaged in*

*See* 60 Stat. 725 (1946); *see also Universal Carloading & Distributing Co. v. Pedrick*, 184 F.2d 64, 65 n. 1 (2d Cir.), *cert. denied*, 340 U.S. 905, 71 S.Ct. 280, 95 L.Ed. 654 (1950).

**11.** The intention of Congress, and the intention of the railroad and of the labor interests that had negotiated and agreed upon the terms of the new legislation, was that coverage under the Carriers' Taxing Act would be coextensive with the Railway Labor Act. *See Hearings on H.R. 6448 Before the House Committee on Ways and Means*, 75 Cong., 1st Sess. 9 (1937); *Railroad Retirement Board v. Duquesne Warehouse Co.*, 326 U.S. 446, 451, 66 S.Ct. 238, 240, 90 L.Ed. 192 (1946); *see also Standard Office Building Corporation v. United States*, 819 F.2d at 1380.

**12.** Joseph B. Eastman, the Federal Coordinator of Transportation, drafted the proposed amendments to the Railway Labor Act of 1934 at Congress' request. *See* 78 Cong.Rec. 12355 (June 18, 1934). Mr. Eastman's testimony has been found authoritative by other courts because of his position as draftsman of the statutory language. *See Itel Corp. v. United States Railroad Retirement Board*, 710 F.2d 1243 (7th

Cir.1983); *Missouri Pacific Truck Lines, Inc. v. United States*, 3 Cl.Ct. 14 (1983), *aff'd per curiam*, 736 F.2d 706 (Fed.Cir.1984); *see also Railroad Retirement Board v. Duquesne Warehouse*, 326 U.S. at 451, 66 S.Ct. at 240. Based on the filings in the record, the parties both appear to agree that Mr. Eastman's statements provide the best evidence of Congressional intent with regard to the phrase "under common control," although they disagree as to the proper context, interpretation and application of his remarks.

**13.** The definition of the term "employer" in the Carriers' Taxing Act of 1937 had its roots in the definition of the term "carrier" in the 1926 Railway Labor Act. *See House Hearings on H.R. 6648 Before the Committee on Ways and Means on Taxation of Interstate Carriers and Employees*, 75th Cong., 1st Sess. 16 (1937). The term used in the first version of the Carriers' Taxing Act to refer to covered companies was "carrier." The term "employer" was substituted in 1937 with no relevant change in the definition. 50 Stat. 307 (1937).

*transportation.* So changed, the definition would read:

> The term 'carrier' includes any express company, sleeping-car company, carrier by railroad, subject to the Interstate Commerce Act, and any company which is directly or indirectly owned or controlled by or under common control with any carrier by railroad and which operates any equipment or facilities or performs any service in connection with the transportation, receipt, delivery, elevation, transfer in transit, refrigeration or icing, storage, and handling of property transported by railroad.

That, I may say, is some of the language in the Interstate Commerce Act.

The CHAIRMAN. Is there some difference, however? *Isn't this reference here to parent, subsidiary, and affiliated, new?*

Mr. Eastman. Yes. *I am confining this now to the railroad subsidiaries* because of the possible conflict with N.R.A. codes if we get into the outside field. . . .

*Hearings on S. 3266 Before the Senate Committee on Interstate Commerce,* 73d Cong., 2d Sess. 145–46 (1934) (emphasis added).

The text of the colloquy between Mr. Eastman and the Chairman shows that Mr. Eastman's definition of "employer" did not seek to include parent companies. Rather, in responding to the Chairman's question, Mr. Eastman specifically said, "I am confining this now to railroad subsidiaries . . . ." This answer reiterated Mr. Eastman's immediately preceding announcement that "I am inclined to believe that for the present it would be well *not to go beyond carriers and their subsidiaries engaged in transportation.*" (Emphasis added).

Citing to the remarks of Representative Mead, a member of the House of Representatives during the consideration of the Carriers' Taxing Act of 1937, 81 Cong.Rec. 6089–90 (1937), the defendant next argues that when Congress enacted the Carriers' Taxing Act of 1937, it broadened the scope of the Act's definition of "employer" to include entities not covered by the 1935 Carriers and Employers Tax Act or the 1934 Railway Labor Act. In a footnote to defendant's one sentence proposition that Congress intended to broaden the scope of the Carriers' Taxing Act definition of "employer," the defendant states:

> Plaintiff's arguments concerning the congressional intent to limit the scope of the RRTA [Railroad Retirement Tax Act] are all drawn from the legislative history surrounding the passage of the 1934 and 1935 Acts. [citations omitted] Plaintiff does not cite to any similar legislative history surrounding the passage of the 1937 Act. This omission is significant given the congressional desire in 1937 to cover 'substantially all those organizations which are intimately related to the transportation of passengers or property by railroad.' S.Rep. No. 818, 75th Cong., 1st Sess. 4 (1937), *reprinted in* 1939–2 C.B. 629, 632.

When Congress passed the Carriers' Taxing Act of 1937, however, it included a definition of "employer" which deferred in most respects to the then-existing definition of "carrier," previously included in the 1935 Carriers and Employees Tax Act.[14] Congress broadened the definition of "employer" in the 1937 Act in only two specific ways, neither of which had any bearing on the interpretation of the phrase "under common control," at issue in the instant case.

The 1935 Railroad Retirement Act had defined "carrier" as "any express company, sleeping-car company, or carrier by rail-

---

**14.** As Rep. Mead remarked about the 1937 Act: "This bill adds rail-service associations to the list of employers and organizations, and their representatives, to those who are entitled to retirement. In some respects [the 1937 Act] broadens existing law, while in some of its provisions it is more restrictive." 81 Cong.Rec. 6089 (1937). The 1937 Act also restricted the definition of "employer" by excluding casual transportation service and casual operation of equipment or facilities. *See* S.Rep. No. 818, 75th Cong., 1st Sess. 4 (1937), *reprinted in* 1939–2 C.B. 629, 632.

road, subject to the Interstate Commerce Act, and any company which may be directly or indirectly owned or controlled thereby or under common control therewith...." Pub.L. No. 74–399, 49 Stat. 967 (1935) (emphasis added). The 1937 Act changed the definition of the term "employer" only slightly: "any carrier [defined as an express company, sleeping-car company, or carrier by railroad, subject to part I of the Interstate Commerce Act], and any company which is directly owned or controlled *by one or more such carriers* or under common control therewith...." Carriers' Taxing Act of 1937, Pub.L. No. 75–174, 50 Stat. 435 (emphasis added). This change from the singular, "one," to the plural, "one or more," did not alter the meaning of the words "under common control" in the two Acts. The Remarks of Rep. Mead, referred to by the defendant, further explain those changes as follows: "Another change from present law is that in the bill the language has been amended to include a company or companies owned or controlled in common by several companies." *See also* 81 Cong.Rec. 6089 (1937).

Second, in the 1937 Act, Congress extended the provisions of existing law and included in the category of employers, in addition to carriers and companies directly or indirectly controlled by them, groups which were not clearly or specifically included in the 1935 Act. As described by Representative Mead:

> These groups include railroad associations, traffic associations, traffic bureaus, demurrage bureaus, weighing and inspection bureaus, collection agencies, and other associations, bureaus, agencies, or organizations controlled and maintained wholly or principally by two or more employers as defined in the bill and engaged in the performance of services in connection with or incidental to railroad transportation, as well as railway labor organizations which are national in scope, organized in accordance with the provisions of the Railway Labor Act, and their State and National legislative committees, general committees, insurance departments, local lodges, and divisions.

81 Cong.Rec. 6090 (1937). These additions also did not change the meaning of the words "under common control." Moreover, the defendant does not argue that the Corporation was covered under any of the new categories included in the 1937 amendments to the Act.

Nothing in the legislative history of the 1937 Carriers' Taxing Act suggests that Congress intended to broaden, or to change the meaning of the words "under common control," beyond the specific words they had earlier chosen to include in the statute. Moreover, it appears that there is nothing in the prior legislative history of the 1934 amendments to the Railway Labor Act of 1926 or the Railroad Retirement Act of 1934 to indicate that Congress intended to include parent holding companies which own carriers in the 26 U.S.C. § 3231(a) definition of the term "employer."

It is presumed that section 3231(a) of the Code was precisely drawn by Congress and that "Congress may be presumed not unskillful in the use of words and highly likely to have enacted what it intended." *Hart v. United States,* 218 Ct.Cl. 212, 230, 585 F.2d 1025, 1035 (1978). Moreover, legislative history should be used extremely cautiously to contradict the words included in a statute. *See id.* The statutory language here at issue is clear and unambiguous:

> For purposes of this chapter, the term "employer" means any carrier (as defined in subsection (g)), and any company which is directly or indirectly owned or controlled by one or more such carriers or under common control therewith, and which operates any equipment or facility or performs any service (except trucking service, casual service, and the casual operation of equipment or facilities) in connection with the transportation of passengers or property by railroad, or the receipt, delivery, elevation, transfer in transit, refrigeration or icing, storage, or handling of property transported by railroad ...

26 U.S.C. § 3231(a). Based on the facts presented by the parties, the language in section 3231(a) simply was not meant to encompass the plaintiff Corporation as it

was structured in relationship to its railroad subsidiary in 1979. If Congress had meant to include within the section 3231(a) control relationships the situation in which a company "owns or controls a carrier," it had several opportunities to specifically write such a provision into the statute, and only then would the plaintiff Corporation have been considered an "employer" within the meaning of the section. There is, however, no such language present in section 3231(a). Extending section 3231(a) to a category of corporate relationships which Congress could have so easily covered, had it intended to do so, can only be justified by a tortured reading of the existing statutory language.

This court is confident, as discussed more fully above, that when Congress enacted the Railroad Retirement Tax Act, it did not intend to include within the section 3231(a) definition of the term "employer," a parent corporation which owns a carrier subsidiary. Therefore, the plaintiff should not be held liable for Railroad Retirement Tax Act taxes for the 1979 tax year. Nonetheless, the court must comment on and dispose of the defendant's assertion woven throughout its papers filed in support of its motion for summary judgment and specifically raised in its separate motion for partial summary judgment that the Corporation performed "services" in connection with the transportation of passengers or property by railroad during the 1979 tax year.

The question of whether services performed by one corporation for another constitute casual services performed "in connection with the transportation of passengers or property by railroad" is a mixed question of fact and law. *See Standard Office Bldg. Corp. v. United States*, 819 F.2d at 1374. The information submitted in the record regarding services allegedly performed by the Corporation for the Railroad, are derived from the Complaint and the various documents submitted by the parties in support of the various cross-motions filed with the court in the above-captioned case. Based on a review of the factual information submitted, and in accordance with the legal standards applicable to the grant or denial of summary judgment motions, discussed fully above, it is this court's decision that, were this court to have found the Corporation to be "under common control" with the Railroad, which the court has specifically declined to do, the court would have to find that genuine issues of material fact exist on the issue of whether the "services" performed exposed the plaintiff to Railroad Retirement Tax liability under the statute. The court would have to examine the services performed to determine the nature and significance of these services in order to decide the applicability of the section 3231(a) services test, i.e., ... the term "employer" means any carrier (as defined in subsection (g)), and any company which is directly or indirectly owned or controlled by one or more such carriers or under common control therewith, *and which operates any equipment or facility or performs any service ... in connection with the transportation of passengers or property by railroad....* 26 U.S.C. § 3231(a) (emphasis added).

As pointed out above, although the plaintiff and defendant seem to agree on the basic factual information of what occurred in the relevant 1979 tax year, the parties strongly disagree as to the nature, significance and characterization of those functions performed by the Corporation and those performed by the Railroad. The defendant maintains that the functions described were performed by the Corporation as "services" for the Railroad in connection with the transportation of passengers or property by railroad. The plaintiff, however, maintains that these functions were performed not as "services" for the Railroad, but, instead, were performed by the Corporation, for the Corporation, in its oversight capacity as a parent holding company. Moreover, the factual data submitted raises significant questions as to which of the functions described as performed by the Corporation, actually duplicated functions also performed by the Railroad. The defendant's allegations that the plaintiff Corporation provided transportation services could not be decided without

weighing evidence which would have to be presented at trial.

## CONCLUSION

In the instant dispute, the defendant has not argued that the Corporation was a "carrier," as defined in section 3231(g) of the Code. Moreover, the defendant has not asserted that the Corporation was "directly or indirectly owned or controlled by" a carrier. In fact, the situation was quite the reverse. The ownership and control that existed were those of the Corporation over the Railroad, just as the Corporation owned and controlled its other subsidiaries engaged in non-transportation operations. Nor can it be said that the Corporation was "under common control" with the Railroad during the 1979 tax year because the Corporation, as the corporate parent, controlled the Railroad.

Therefore, for the reasons discussed above, the plaintiff's motion for summary judgment is GRANTED. Defendant's motion for summary judgment and defendant's motion for partial summary judgment are DENIED.

IT IS SO ORDERED.